STATE of Wisconsin, Plaintiff-Respondent,†

v.

William HARTMAN, Defendant-Appellant-Petitioner.

Supreme Court

*No. 86–1188–CR. Argued April 26, 1988.—Decided July 19, 1988.*

(Also reported in 426 N.W.2d 320.)

† Motion for reconsideration denied, without costs, on September 13, 1988. DAY and STEINMETZ, JJ., dissent.

1

For the defendant-appellant-petitioner there were briefs and oral argument by *Mary E. Waitrovich,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Barry M. Levenson,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

WILLIAM G. CALLOW, J. This is a review of an unpublished decision of the court of appeals which affirmed a judgment of conviction entered by the circuit court for Columbia county, Judge Lewis W. Charles, which found William Hartman guilty of second-degree sexual assault.

On review, William Hartman (Hartman) raises two issues. First, in a criminal case in which the defendant is charged with having sexual intercourse with a girl between the ages of twelve and sixteen, can the state enter into evidence the results of human

leukocyte antigen and red blood cell tests? Second, did the admission of expert testimony that Hartman was the father of the victim's child deny Hartman due process and a fair trial? We conclude that two of the statistics generated by the human leukocyte antigen tests—the probability of exclusion and paternity index—are admissible in a criminal case in which the defendant is charged with sexual assault. However, we conclude that a third statistic—the probability of paternity—is inadmissible in such a case. Because the state's introduction into evidence of Hartman's probability of paternity based upon the human leukocyte antigen tests constituted prejudicial error, we reverse the decision of the court of appeals. Because we conclude that the admission of the probability of paternity constitutes prejudicial error and, therefore, requires a new trial, we do not reach the question of whether the admission of expert testimony that Hartman was the father deprived Hartman of due process or denied him a fair trial.

In August of 1985, defendant Hartman was charged with two counts of second-degree sexual assault. The charges were based upon allegations that Hartman had sexual intercourse with a fourteen-year-old girl, B.S., on or about April 7, 1984, and on or about April 15, 1984. Hartman interposed an alibi defense, and the case proceeded to trial in January, 1986.

At trial, B.S. testified to the following. On Saturday, April 7, 1984, B.S. went to her father's house to pick up some money to pay for bowling. Upon arriving at the house, she knocked on the door and was let into the house by Hartman, the brother of her father's roommate. Hartman was the only one home at the time. After searching unsuccessfully in the kitchen,

4

B.S. went to her father's bedroom to look for the bowling money.

According to B.S., Hartman followed her into the bedroom and asked several times if she wanted to go to bed with him. Although B.S. refused repeatedly, Hartman eventually pushed her onto the bed and had sexual intercourse with her. Both Hartman and B.S. left the house shortly thereafter. B.S. did not tell anyone at that time what had happened.

On Sunday, April, 15, 1984, B.S. was at her father's house with her father and brothers. After her father and brothers left to play ball, B.S. went into the bathroom to get some dirt out of her eye. While she was trying to clear the dirt from her eye, Hartman entered the bathroom, removed B.S.'s clothing, and had sexual intercourse with her on the bathroom floor. B.S. also did not immediately tell anyone of this second incident.

In October, 1984, B.S. told the police and her mother that she had been raped in a ravine by a man she did not know. About a week later, B.S. went back to the police station, recanted her story about the man in the ravine, and told the police that Hartman had raped her.

B.S. further testified that she was fourteen years of age at the time Hartman had sex with her and that she became pregnant during 1984. According to B.S. her last menstrual cycle was on or about March 20, 1984. Moreover, she did not have sexual intercourse with anyone other than Hartman between her last menstrual period and the birth of the baby.

George Gaucys (Gaucys), director of the Histocompatibility Laboratory at the Madison Red Cross, testified concerning the results of human leukocyte antigen (HLA) and red cell tests which were done on

blood samples taken from B.S., her child, and Hartman. According to Gaucys, 98.48 percent of all falsely accused men would be excluded by the tests run in this case. Moreover, Hartman could not be excluded as the father under the tests "[b]ecause [Hartman] had the necessary, or obligatory haplotype, or genes, to be the father of this child."

Gaucys further testified that the tests indicated that Hartman had a paternity index of fifty-six. According to Gaucys, a paternity index of fifty-six "means that this man, William Hartman, is 56 times more likely to be the true father than a random man from the same population." Gaucys also testified that there was a 98.26 percent chance that Hartman was the real father. According to Gaucys, the chance that Hartman was the father, or the probability of paternity, was based upon assuming a 50 percent chance. When asked to explain what was meant by a 50 percent chance, Gaucys stated: "Fifty percent prior chance, or prior probability. This shows that the laboratory is completely neutral. We don't give any weight for or against this particular man in this case." Moreover, the 50 percent prior chance did not take into account accessibility, whether Hartman lived in the same community or any factors outside of the genetic evidence. Based upon the test results, Gaucys concluded that paternity was "very likely." In conclusion, Gaucys testified that the probability of paternity could never reach 100 percent because it was possible that another person could have the same genetic markers necessary to be the father of the child in question.

On cross-examination, Gaucys again testified that the probability of paternity could never reach 100 percent. Moreover, in response to defense counsel's

6

question whether he could testify within a degree of medical certainty that Mr. Hartman is the father of this child, Gaucys stated "[w]ithin all the tests that we've done, and in my opinion, yes, sir." On further cross-examination, Gaucys reiterated that the tests could not reach 100 percent, i.e., there is an element of doubt in the conclusion that Hartman is the father.

Hartman testified on his own behalf and presented a partial alibi defense. Hartman testified that he was in La Crosse on April 6, 1984, and that he returned to his parents house in the Wisconsin Dells area around noon on April 7. According to Hartman, he slept for approximately twenty minutes, at which time he was awakened by a telephone call from his brother. After arranging to go to Green Bay with his brother for a racquet ball tournament, Hartman slept a short while longer. At 2 p.m. Hartman and his brother went to Green Bay where Hartman spent the night. Hartman's brother and a friend of Hartman offered testimony in support of Hartman's contention that Hartman was in Green Bay on the 7th of April.

Hartman also testified that he visited friends in La Crosse from April 13 through April 16. Hartman denied being at his brother's house on April 7 or April 15 and denied having sexual relations with B.S. at any time.

Hartman was found guilty of second-degree sexual assault for having sexual intercourse with B.S. on or about April 7, 1984, and was acquitted of the charge of sexual assault stemming from the alleged incident on or about April 15, 1984. A judgment of conviction was entered, and Hartman was subsequently sentenced to an indeterminate term of not more than three years in the Wisconsin State Prison. Execution of the sentence was stayed, and Hartman was placed

on probation for three years, with a condition of probation to spend six months in the county jail under a work release program. Hartman appealed the judgment of conviction to the court of appeals.

In an unpublished decision, the court of appeals affirmed the judgment of conviction. First, the court of appeals rejected Hartman's contention that Gaucy's testimony that Hartman was the father of the child improperly bolstered B.S.'s credibility. According to the court, although opinion testimony that someone is telling the truth is inadmissible, Gaucys' testimony was not an opinion that B.S. was telling the truth. Instead, the court concluded that the testimony merely corroborated B.S.'s claim that intercourse had occurred. According to the court, because corroborating evidence is not the same as giving an opinion that someone is telling the truth, Gaucys' testimony that Hartman was the father of the child was admissible.

The court of appeals also rejected Hartman's contention that the state was relieved of its burden of proof when the court instructed the jury that the state did not have to prove the exact date of the offense. According to the court, because there was no testimony concerning the exact date of the offense, the state did not have to prove the exact date of the offense. Finally, the court concluded that Hartman did not specifically object at trial to the admission of the paternity results in terms of a statistical probability. Accordingly, the court of appeals did not review that issue.

In November, 1987, we accepted Hartman's petition for review. On review, Hartman raises only the issues of whether the circuit court erroneously admitted the HLA and red blood cell test results and whether Gaucys' testimony that Hartman was the

father of the child improperly bolstered B.S.'s credibility. Hartman does not raise the issue of whether the jury instructions relieved the state of its duty to prove the exact date of the offense.

The state argues initially that we should not address the issue of the admissibility of the paternity statistics because Hartman did not present to the circuit court the grounds upon which he now claims the statistics were inadmissible and that this failure constitutes a waiver of his right to review. According to the state, although Hartman objected to the admission of the paternity statistics, Hartman did not inform the circuit court of the objections he now raises, i.e., that admission of the test results *in terms of a statistical probability* deprived him of a fair trial. Hartman contends, however, that he is merely refining and expanding trial counsel's arguments and is not raising a new issue.

We have previously held that objections to the admissibility of evidence must be made promptly and in terms which inform the circuit court of the exact grounds upon which the objection is based. *State v. Wedgeworth,* 100 Wis. 2d 514, 528, 302 N.W.2d 810 (1981). Moreover, an objection preserves for appeal only the specific grounds stated in the objection. *Frankovis v. State,* 94 Wis. 2d 141, 152, 287 N.W.2d 791 (1980). Our review of the record convinces us that the objection raised by Hartman before the circuit court was not sufficient to apprise the court of the exact grounds upon which he now challenges the admissibility of the statistical evidence.[1] Accordingly,

---

[1]Hartman's objection to the admissibility of the statistics was as follows:

Hartman has waived his right to object to the admissibility of the statistics derived from the HLA and red blood cell tests.

Although objections which have been waived are not reviewable as a matter of right, this court may nevertheless order a new trial if it appears from the record that the real controversy has not been fully tried or that there has been a miscarriage of justice. Sec. 751.06, Stats.[2] In *State v. Wyss,* 124 Wis. 2d 681,

"THE COURT: And, on what grounds are you objecting to—

"MR. MURPHY: Well, your Honor, I reversed what I wanted to do.

"The District Attorney's office thought it was an admissible evidentiary item.

"I point out to the Court that under 885.23 of the Wisconsin Statutes, the result of those tests are specifically limited to civil matters, and there's no expression in the particular section of law and witnesses that deals with the use in criminal trials.

"Point out to the Court that I consider this to be a violation of a Constitutional right to the defendant against self incrimination, and I am objecting to the introduction of the blood test.

"The matter before the Court is an alleged charge of two counts of rape, under the laws of the State of Wisconsin.

"It's my position that if there's proof that there was either conception or that a test was taken, it would have a tendency to mislead the jury, and in fact, it would inflame them against the defendant and it creates a situation to where he's not being tried on the merits as to whether or not he allegedly raped this girl.

"Intercourse is not even a part of the charge. Specifically, erection, discharge of semen, are not elements of the offense at all. It's whether or not there's been sexual contact.

"And, on that basis, I believe that the State is misdirecting the intention of the jury against the rights of the defendant in this matter to secure a fair and impartial trial; and I make my objection, both on the ground of inflaming of the jury, unfair trial; and violation of the Constitutional rights of the defendant."

[2]Section 751.06, Stats., provides: "**Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that

10

735, 370 N.W.2d 745 (1985), we recognized that there are two distinct ways in which the real controversy may not have been fully tried. First, "when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case, ... and [second] when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *Id.* (citations omitted). Because we conclude that the jury in this case had evidence before it which was improperly admitted which prohibited the real controversy from being fully tried, we review Hartman's claim of error and order a new trial.

The primary question before us is whether the circuit court erroneously admitted HLA and red blood cell test results into evidence. In this case three statistics were admitted into evidence: the probability of exclusion, the paternity index, and the probability of paternity. The first statistic—the probability of exclusion—"measures the ability of a paternity test to exclude men falsely accused of paternity." *In re Paternity of M.J.B.,* 144 Wis. 2d 638, 647, 425 N.W.2d 404 (1988). Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask),* 22

the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

Santa Clara L. Rev. 667, 677 (1982). In other words, if the probability of exclusion was 96 percent, then 96 out of 100 falsely accused men would be excluded as the father by the tests.

The second statistic—the paternity index—is expressed as a ratio and compares the likelihood that the putative father could produce a child with the same genetic markers as the child in question with the likelihood that a random man could produce a child with the same genetic markers as the child in question. *M.J.B., supra* at 647. This statistic does not describe the relative likelihood of producing *the* child in question, only the relative likelihood of producing *a* child with the same genetic markers as the child in question.

The third and final statistic—the probability of paternity—expresses the probability that the putative father is the actual father of the child in question. The probability of paternity is determined through the use of a mathematical model, Bayes' Theorem, which describes the way new statistical information (the paternity index) alters a previously established probability (the previously established probability that the putative father is the father of the child in question). *See* Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?*, 54 N.Y.U. L. Rev. 1131, 1147–48 (1979).

Bayes' Theorem, however, does not define the prior probability; the prior probability of paternity must be derived independently. Typically, a 50 percent prior probability is employed to calculate the probability of paternity.[3] *M.J.B., supra* at 648 n. 5.

---

[3] Ellman and Kaye criticize the use of a 50 percent probability, arguing that "[t]here seems to be no basis for the blanket

Described by the state as being neutral, a 50 percent prior probability assumes a 50 percent likelihood that the defendant is the father and a 50 percent likelihood that a randomly selected man is the father. *See M.J.B.*, at 648. In other words, the prior probability of paternity assumes that it is just as likely that the putative father is the real father as it is that he is not the real father.

With these parameters in mind, we turn to whether the paternity statistics are admissible in a criminal case in which the defendant is charged with sexual assault. Hartman argues first that paternity statistics which include the defendant as a possible father are not relevant and thus inadmissible because the statistics show only that the defendant is one of a group of possible fathers; in other words, the statistics do not conclusively prove paternity. According to Hartman, only statistics which prove nonpaternity are relevant because they are able to conclusively exclude the defendant as the father and thus prove his innocence. We disagree.

■

Whether evidence is relevant and thus admissible[4] depends upon whether the evidence tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Sec. 904.01, Stats.; sec. 904.02, Stats. In criminal cases in which the defendant is charged with sexual assault and a child is born consistent with the time period

assumption that the prior probability is one-half." Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?*, 54 N.Y.U. L. Rev. 1131, 1150 (1979).

[4]To be admissible, the evidence must also be more probative than prejudicial. Sec. 904.03, Stats.

indicating that the child could have been conceived as a result of the sexual assault, evidence which indicates the identity of the father is germane to a determination of whether the defendant had sexual intercourse with the victim. Moreover, because consent is not at issue when the sexual assault involves a person under the age of sixteen,[5] evidence which indicates that the defendant could be the father constitutes evidence that the defendant committed the charged offense. Accordingly, the criminal cases in which the defendant is charged with sexual assault and a child is born consistent with a time period indicating that the child could have been conceived as a result of the sexual assault, evidence which tends to make it more or less probable that the defendant is the father is relevant.

We are satisfied that the probability of exclusion and the paternity index are relevant to a determination of the identity of the perpetrator of a sexual assault when the statistics include the defendant as a possible father of the child. Statistics which include the defendant as a possible father are relevant because they make the identification of the defendant as the father more probable than it would be without the statistical evidence, in that the statistics limit the number of men who could be the father.

We are not persuaded by Hartman's argument that the statistics are not relevant because they do not conclusively determine the identity of the father. To be relevant, evidence does not have to determine a fact at issue conclusively; the evidence needs only to make the fact more probable than it would be without the evidence. Because the probability of exclusion and the

[5]Under sections 940.225(1)(d) and (2)(e), Stats., consent is not an element of sexual assault when the victim is under the age of sixteen.

paternity index make the identification of the defendant as the father more probable, they are relevant.

Moreover, we disagree with Hartman's contention that, because the statistics may be susceptible to misapplication, the statistics are inadmissible. We recognize the concern expressed by commentators and other courts that a jury who is told that the probability of exclusion is 98 percent may interpret this statistic to mean that it is 98 percent certain that the defendant is the father. *See Commonwealth v. Beausoleil*, 397 Mass. 206, 217, 490 N.E.2d 788 (1986); Peterson, *supra*, 22 Santa Clara L. Rev. at 678–80. However, we are satisfied that any susceptibility to misapplication can be alleviated by diligent cross-examination.[6] Accordingly, we hold that the probability of exclusion and the paternity index are admissible in a criminal action in which the defendant is charged with sexual assault and the sexual assault allegedly results in the birth of a child.

Although we have concluded that the probability of exclusion and the paternity index are admissible in criminal proceedings, we are not convinced that a defendant's probability of paternity is also admissible. Unlike the probability of exclusion and the paternity index, the probability of paternity assumes certain

---

[6]The likelihood that a jury would equate the probability of exclusion with the probability that the defendant is the father can be remedied easily. For example, if the jury is told that the probability of exclusion is 98 percent, defense counsel can highlight that a probability of exclusion of 98 percent means that, where the relevant male population is one hundred thousand, two thousand men would not be excluded by the probability of exclusion. Thus, based solely upon the probability of exclusion, the probability that the defendant is the father is one out of two thousand.

15

facts as a condition of its calculation. As we noted earlier, the calculation of a defendant's probability of paternity is typically based upon a 50 percent prior probability which arbitrarily assumes a 50 percent likelihood that the defendant is the father, and a 50 percent likelihood that a randomly selected man is the father. In other words, the probability of paternity is calculated based upon the assumption "that the mother and putative father have engaged in sexual intercourse at least once during the period of possible conception." *M.J.B., supra* at 650. Because the probability of paternity assumes that sexual intercourse has occurred, it is improper to use this statistic to prove that sexual intercourse has occurred.

Evidence which informs the jury of the probability that the defendant is the father of a child who was alleged to have been conceived as a result of a sexual assault perpetrated by the defendant is clearly relevant to the determination of whether the defendant sexually assaulted the mother of the child. However, it is antithetical to our system of criminal justice to allow the state, through the use of statistical evidence which assumes that the defendant committed the crime, to prove that the defendant committed the crime. Because the probability of paternity assumes the fact that it is used to prove, it is inadmissible.[7]

[7]We note that there is now available a technique for matching deoxyribonucleic acid (DNA) which may prove to be a better method of determining paternity. *See generally* Thompson, *DNA's Troubled Debut,* 8 Cal. Lawyer 36 (June, 1988); *Court Commentaries,* Newsletter of the Virginia Judicial System, Vol. 14, No. 2 (April, 1988); The National Law Journal, Vol. 10—No. 19, January 18, 1988, at 42, col. 1 (weekly ed.).

Having concluded that a defendant's probability of paternity is inadmissible in a criminal case in which the defendant is charged with sexual assault, we hold that the circuit court erred in admitting into evidence the statistic indicating Hartman's probability of paternity. Moreover, the crucial issue in this case is whether Hartman had sexual intercourse with B.S. Because the probability of paternity statistic appeared to provide substantial evidence that Hartman had sexual intercourse with B.S., we conclude that the erroneous admission of this evidence so clouded the determination of whether sexual intercourse occurred that the real controversy in this case was never fully tried. Accordingly, we reverse the judgment of conviction and remand the cause to the circuit court for a new trial.

Because we conclude that Hartman is entitled to a new trial, we do not address the second question before us on review—whether the admission of expert opinion testimony that Hartman was the father of B.S.'s child denied Hartman due process and a fair trial. We note, however, that when an interrogator at trial asks a witness a question and receives an answer which is responsive to the question, the interrogator is generally bound by that answer.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for proceedings consistent with this opinion.

DAY, J. (dissenting). I join Justice Steinmetz's dissent with the exception of his conclusion that using no HLA blood test statistics at all is preferable to permitting only the use of the percentage of exclusion

17

and paternity index. *See* dissent at 20. As both the majority and dissent have shown, all three types of statistical analysis can be misleading if viewed in isolation without an explanation of the statistical significance of the percentages or other numbers derived from the genetic testing. The majority paternity index illustration, that "the probability that the defendant is the father is one out of two thousand" in an urban area with a large population, at 15 n. 6, is a clear example of how presentation of numbers can be misleadingly skewed when pulled out of context and used standing alone.

Nevertheless, simply because circumstantial evidence may be difficult to understand or possesses the potential to be misconstrued does not necessarily mean it lacks probative value. Statistical evidence which shows that the defendant's genetic markers are consistent with those of the child conceived by the victim used in conjunction with testimony from the victim identifying the defendant as the person with whom she had intercourse during the conceptive period, as well as the submission of other circumstantial evidence, can be quite probative.

I believe that using all three statistics, the probability of exclusion, paternity index, and probability of paternity, produces the most accurate method of analyzing the genetic marker information derived from HLA blood testing. However, given the choice between using two of the three statistics or using no evidence regarding genetic testing, I conclude the information provided by the two statistics is more beneficial to the trier of fact than no genetic analysis at all. Though I would apply the majority's reasoning to all three types of statistical evidence, its conclusion is correct that "any susceptibility to misapplication [of

the statistical information] can be alleviated by diligent cross-examination." Majority op. at 15.

STEINMETZ, J. (dissenting). I would allow all of the results of the blood test to be received in evidence and considered by the trier of fact. As we held in *In re the Paternity of M.J.B.: T.A.T. v. R.E.B.*, 144 Wis. 2d 638, 425 N.W.2d 404 (1988), which was a paternity case and therefore a civil action, the test is credible evidence the weight of which should be argued to the factfinder. Because this is a criminal case, however, the test should be admitted only through expert testimony before its weight can be considered.[1] The requirement of an expert to introduce the test results, coupled with the opportunity by defense counsel to examine the expert and thus explain the method of calculating paternity, sufficiently compensates for any alleged problems inherent in the Bayesian formula.

The 50 percent prior chance assumption does not require shifting the burden of proof to the defendant and is not an impermissible assumption; rather, it is part of a scientific theorem and the jury should be so told. Contrary to the majority's assertion, the assumption is valid because the defendant has been named as the male having had sexual intercourse with the mother. In this case, the mother was the victim of a sexual assault and accused the defendant of being the father of her child as a result of his act. Therefore, the defendant was not randomly selected, but rather, had been named in a sworn complaint or information. That is, the "assumption" that is used in the probabili-

---

[1] In a civil case the blood test results are admissible without expert testimony. Sec. 767.48(1), Stats.

19

ty of paternity computation was not presented into evidence in a vacuum, but was instead admitted only after a factual basis for the statistic was offered into evidence.

As we stated in *M.J.B.*, in order for the probability of paternity statistic to have any relevance, there must be proof of a sexual act between the defendant and the mother during the conceptive period. Once competent evidence is presented on that issue, the trier of fact should then be able to consider the probability of paternity along with all other evidence in determining guilt beyond a reasonable doubt. Effective cross-examination by defense counsel can sufficiently safeguard against the concerns raised by the majority.

Thus, even if I were to join the majority, I would not agree to limit the use of the blood test results to the two statistics held admissible by the majority. If only the probability of exclusion and paternity index are allowed to be presented to the jury, they are incomplete, misleading and at best confusing. *See Davis v. State*, 476 N.E.2d 127, 137 (Ind. App. 1985). Most importantly, however, they are far less probative of the fact at issue than the probability of paternity statistic. Such piecemeal use of the blood test results is of minimal advantage to the mother's case or the prosecutor. If that is all that is admissible, the prosecution would be better advised not to use the blood test at all as evidence. One out of 2,000 is not a very convincing statistic and is of questionable value. *See* majority op. at 15, n. 6. Rather than permitting a partial use of figures resulting from the blood test, I would exclude all of the results from being used during a criminal trial.

The probability of exclusion only measures the percent of falsely accused men who would be excluded as the father. While this figure does not rely on the 50 percent prior chance assumption, by itself it is a misleading and confusing figure. This statistic does not measure the likelihood that the defendant produced the child born allegedly as a result of the sexual assault. Introduction of the probability of exclusion will necessarily raise this question in the jurors' minds. Rather than provide any meaningful information to aid in their determination, the majority leaves the jury to speculate about the likelihood that the person accused is actually the child's father. Moreover, the probability of exclusion is expressed in confusing and abstract terms; it reveals only the percentage of falsely accused men who would be excluded as the father. At trial, the defendant has been accused of being the father, not unknown men who would be falsely accused by the victim mother.

The paternity index ratio measures the genetic odds in favor of paternity. However, it describes only the relative likelihood of the defendant producing a child with the same genetic markers. Again, it does not measure the relative likelihood of producing the child born to the victim. As such, when presented without the probability of paternity, this figure also leaves the jury to speculate and raises more questions than it answers.

Contrary to the majority's belief, the probability of paternity statistic does not "assume that the defendant committed the crime." At 16. It is true that the blood test examiner, in order to calculate this statistic, must assume that it is as likely as not that the putative father had sexual intercourse with the mother. This limited assumption is made for statisti-

21

cal purposes only in order to calculate the relative likelihood of paternity. In this regard, it is indeed neutral, because it does not consider evidence outside of the genetic data, however damning. That is, even if the alleged event of sexual intercourse occurred in front of witnesses, the statistician would still compute the results on the basis of only a 50 percent prior likelihood of intercourse. The blood test examiner certainly makes no assumptions whatsoever about criminal acts. The assumption is in this regard statistically neutral. *See Davis,* 476 N.E.2d at 138.

The majority suggests, in effect, that the evidence is not legally neutral, *i.e.,* an assumption is made that the defendant had sexual intercourse with the victim. Because, as we held in *M.J.B.,* blood test results can never be introduced without independent competent evidence of that very fact—sexual intercourse during the conceptive period—any "assumption" is made with sufficient foundation. In essence, the blood test results corroborate other evidence admitted.

Moreover, cross-examination and argument by counsel will reveal to the jury that the assumption is made in the statistical computation. As with all expert testimony, the jury is free to reject or accept its value. The assumption does not shift the burden of proof, but it does bring courts into the 20th century by permitting the use of a universally acceptable scientific formula with a recognized high degree of accuracy. The use of all of the test results, in my opinion, has great probative value which outweighs any prejudicial effects.

Finally, it should be noted that several other jurisdictions permit the introduction of HLA blood test results, including the probability of paternity statistic, into evidence in criminal trials where a child

is born allegedly as a result of a sexual assault. *See, e.g., Holley v. State,* 523 So. 2d 688 (Fla. App. 1988); *State v. Smith,* 735 S.W.2d 831 (Tenn. Cr. App. 1987); *State v. Spann,* 219 N.J. Super. 85, 529 A.2d 1039 (1987); *State v. Thompson,* 503 A.2d 689 (Me. 1986). *See also Davis, supra* (wherein court affirmed defendants' convictions for felony child neglect and expressly upheld the use of probability of parentage statistics which relied on 50 percent prior chance assumption); Annot., *Admissibility, Weight, and Sufficiency of Blood-Grouping Tests in Criminal Cases,* 2 A.L.R.4th 500 (1980 & 1988 Supp.) and cases reviewed therein. Indeed, the conspicuous absence in the majority opinion in this case of any authority from other jurisdictions regarding the inadmissibility of probability of paternity test results in criminal prosecutions further convinces me that this statistic should be considered together with the other HLA test results when relevant.

I would affirm the court of appeals.

I am authorized to state that JUSTICE LOUIS J. CECI joins this dissenting opinion and JUSTICE ROLAND B. DAY joins in part.