236 N.J. Super. 13 (1989)
563 A.2d 1145
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH M. SPANN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1989.
Decided August 9, 1989.
*15 Before Judges MICHELS, MUIR and KEEFE.
Michael B. Einschlag, Designated Counsel, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; Michael B. Einschlag, of counsel and on the brief).
Julie Davidson, Deputy Attorney General, argued the cause for respondent (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Julie Davidson, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
*16 Tried to a jury, defendant Joseph M. Spann, a corrections officer at the Salem County Jail, was convicted of second degree sexual assault in violation of N.J.S.A. 2C:14-2c and third degree official misconduct in violation of N.J.S.A. 2C:30-2. Defendant's motions for a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial, were denied. Thereafter, the trial court merged defendant's conviction for official misconduct into his conviction for sexual assault, committed defendant to the custody of the Commissioner of the Department of Corrections for a term of six years and assessed a penalty of $30 payable to the Violent Crimes Compensation Board. Defendant appeals.
The record shows that on December 13, 1985, Carmen Guzman (Guzman) was placed in the Salem County Jail on a detainer from the Immigration and Naturalization Service. Guzman, a native of the Dominican Republic, faced deportation hearings in Philadelphia because she had committed a federal narcotics offense. Defendant and codefendant Anita Sistrunk (Sistrunk) were employed as corrections officers at the Salem County Jail at the time of Guzman's incarceration.
Male and female inmates at the Salem County Jail are housed in different sections of the facility. The female section of the jail is located on the third floor and consists of, among other things, a dormitory, a security room and a room for the on-duty female corrections officer. This section is supervised by female corrections officers. It is separated from the male section by two security doors that are locked at all times to ensure that the male inmates and the male corrections officers are kept apart from the female inmates.
Generally, male corrections officers, other than the shift supervisor, are allowed inside the female section of the jail only in the event of an emergency situation, such as an inmate fight. Access to the female section may be gained only at the allowance of the on-duty female corrections officer or by use of a *17 pass key that is located in the jail's control room. The control room is manned by the shift sergeant, who is responsible for supervising the entire jail, including both the male and female sections.
Guzman first encountered defendant in the jail's cafeteria a few days after she arrived at the jail. At this time, defendant passed a note to Guzman containing his telephone number and a request that Guzman call him. (A telephone capable of handling only outgoing collect calls was located in Guzman's dormitory.) Guzman and defendant frequently spoke to each other on the telephone and exchanged photographs and love letters. Many of these exchanges were made by way of Sistrunk. Defendant also passed to Guzman, by way of Sistrunk, a cassette tape of Latin music.
On the night of January 25, 1986, Sistrunk, who was on duty in the female section of the jail, brought Guzman from her dormitory to the security room that was adjacent to the dormitory. After escorting Guzman into the room, Sistrunk departed, switching off the lights and closing the door as she left. Thereafter, defendant emerged from an anteroom in the security room. Guzman testified that she was surprised and concerned about this situation because she had been unaware that she was to be brought to the security room and because, as she put it, she was a prisoner and defendant was a guard.
Defendant, who was wearing his guard uniform, approached Guzman, touched her shoulder and attempted to kiss her on the mouth. Guzman, however, pushed defendant away. Thereafter, defendant motioned for Guzman to remove her robe because he wanted her "to make love with him." Guzman testified that she was afraid because she believed that, "under the circumstances," she would have to give in to defendant. Eventually, defendant engaged in sexual intercourse with Guzman. Afterwards, defendant knocked on the door three times and Sistrunk escorted Guzman back to her dormitory.
*18 Guzman testified that she neither screamed nor fought off defendant because she simply wanted to get out of jail and "didn't want any scandals." She stated that she didn't report the incident at the time because defendant twice warned her against such action. Guzman testified that she had not had sexual intercourse with anyone other than defendant during her incarceration. Finally, Guzman stated that a few days after the alleged sexual assault, Sistrunk brought her into an office, where defendant, who was in uniform, told her to destroy the letters, photograph and cassette tape that he had given to her.
Sometime after the incident, Guzman experienced stomach pains and headaches and was unable to eat. She was tested by the jail physician and informed that she was pregnant. Guzman's child was born on October 10, 1986.
Defendant and Sistrunk, on the other hand, painted an entirely different picture of the circumstances of their employment at the Salem County Jail. Defendant contended that he met Guzman in the end of December 1985, as he helped her remove some luggage from an elevator. He stated that he was never alone with Guzman and that he and Guzman passed notes to each other by leaving them on the table in the cafeteria. He also stated that he never kissed, hugged or made physical contact with Guzman. Although defendant was on duty on January 25, 1986, he stated that he did not have the key to the female section, did not go to the third floor of the jail and did not have sexual relations with Guzman. Finally, defendant claimed that he could not be the father of the child born to Guzman on October 10, 1986, because he has been unable to obtain an erection since prior to 1985. Sistrunk contended that she did not set up an encounter between defendant and Guzman and that she never passed letters between the two. Sistrunk stated that she was in charge of the female section on January 25, 1986, and that defendant did not enter the female section during her shift.
*19 In order to corroborate Guzman's testimony that defendant had sexually assaulted her, the State presented the testimony of Dr. Frank Redo, an obstetrician-gynecologist, and Dr. Leslie Johnson, a geneticist with extensive experience in Human Leucocyte Antigen (HLA) testing. Dr. Redo testified that a birth date of October 10, 1986, was within the range of a normal term pregnancy if conception occurred on January 25, 1986, the date of the alleged sexual assault. Dr. Johnson testified that six red-blood cell tests and an HLA test indicated that defendant could not be excluded as the father of Guzman's child. Thereafter, Dr. Johnson testified concerning the "probability of exclusion" and the "probability of paternity", two statistical computations based on the results of the HLA test.
On the basis of the foregoing evidence defendant was found guilty of second degree sexual assault and official misconduct. On appeal, defendant seeks a reversal of his convictions on the following grounds set forth in his brief:
I. THE TRIAL COURT ERRED WITH RESPECT TO THE STATE'S USE OF THE RESULTS OF AN HLA BLOOD TEST: (A) BY PERMITTING TESTIMONY REPORTING A COMPUTATION OF "PROBABILITY OF PATERNITY" BECAUSE THAT COMPUTATION WAS BASED ON AN ILLEGAL ASSUMPTION OR, ALTERNATIVELY, (B) BY PERMITTING TESTIMONY REPORTING THE "PROBABILITY OF PATERNITY" WITHOUT REQUIRING TESTIMONY SETTING FORTH THE ERROR IN THE VALUE BECAUSE EVERY SCIENTIFIC MEASUREMENT NECESSARILY INCURS MEASUREMENT ERROR.
II. THE TRIAL COURT ERRED WHEN IT DID NOT ORDER THE ENTRY OF A JUDGMENT OF ACQUITTAL, SUA SPONTE IN ACCORDANCE WITH R. 3:18-1, BECAUSE THE STATE PROVIDED NO EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND THAT DEFENDANT HAD SUPERVISORY OR DISCIPLINARY POWER OVER PRISONER GUZMAN AT THE TIME OF THE ALLEGED SEXUAL ASSAULT AND, THEREFORE, THE EVIDENCE WAS INSUFFICIENT TO WARRANT A CONVICTION. (Not Raised Below).
III. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST TO CHARGE THE JURY ON THE ISSUE OF CONSENT AS TO COUNT 3 OF THE INDICTMENT RELATING TO N.J.S.A. 2C:14-2(c)(3).

I.
Initially, it should be noted that defendant is not contesting the trial court's ruling that HLA test results may be used in a *20 criminal trial. State v. Spann, 219 N.J. Super. 85 (Law Div. 1987). Rather, defendant contends that the trial court erred in allowing into evidence testimony regarding the "probability of paternity" because that computation was based on an "illegal assumption" or, alternatively, by allowing such testimony without requiring testimony on the potential measurement error. The State, on the other hand, argues that the "probability of paternity" computation was properly based on an accepted scientific variable and that the potential measurement error was explained to the jury.
It is well established that the results of scientific tests are admissible at a criminal trial only when they are shown to have a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth. State v. Kelly, 97 N.J. 178, 210 (1984); Romano v. Kimmelman, 96 N.J. 66, 80 (1984); State v. Cavallo, 88 N.J. 508, 517 (1982); State v. Hurd, 86 N.J. 525, 536 (1981); State v. Prudden, 212 N.J. Super. 608, 617 (App.Div. 1986); State v. Kelly, 207 N.J. Super. 114, 121 (App.Div. 1986). A proponent of scientific evidence can prove the general acceptance and thereby the reliability of evidence
(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis;
(2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance. [State v. Kelly, supra, 97 N.J. at 210 (citing State v. Cavallo, supra, 88 N.J. at 521).]
See Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 379 (1987); State v. Prudden, supra, 212 N.J. Super. at 617-618.
Expert testimony is admissible if (1) the intended testimony concerns a subject matter that is beyond the ken of the average juror; (2) the field in question is at a state of the art such that an expert's testimony could be sufficiently reliable, and (3) the witness has sufficient expertise to offer the *21 intended testimony. State v. Kelly, supra, 97 N.J. at 208. See Biunno, Current N.J.Rules of Evidence, Comment 5 to Evid.R. 56. A jury, however, need not give controlling effect to any or all of the testimony provided by experts even in the absence of evidence to the contrary. "The jury may adopt so much of it as appears sound, reject all of it, or adopt all of it." State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932) (quoted in Amaru v. Stratton, 209 N.J. Super. 1, 20 (App.Div. 1985)). See also State in the Interest of C.A.H. & B.A.R., 89 N.J. 326, 343 (1982); State v. Perez, 218 N.J. Super. 478, 486 (App.Div. 1987).
A decade has passed since HLA test results were first held to be admissible in New Jersey, in a civil trial, as an aid to establishing paternity. Malvasi v. Malvasi, 167 N.J. Super. 513, 516 (Ch.Div. 1979). Since that first decision, numerous courts of this state have recognized the value of HLA testing in addressing issues pertaining to paternity. See R.K. v. Dept. of Human Services, 215 N.J. Super. 342, 346-347 (App.Div. 1987) (where this court stated that HLA tests that are properly performed are admissible but not conclusive evidence of exclusion of paternity); Essex Cty. Welfare Div. v. Harris, 189 N.J. Super. 479, 484 (App.Div. 1983) (where this court noted that HLA testing constitutes a significant advance in providing a reliable scientific tool for the fair and correct resolution of disputed paternity issues); Moore v. Hafeeza, 212 N.J. Super. 399, 408 (Ch.Div. 1986) (where the trial court dismissed an attempt to establish paternity as barred by laches and principles of res judicata and collateral estoppel, but in so doing noted that HLA testing is accepted by the scientific community as a reliable and accurate test for the exclusion of paternity); J.H. v. M.H., 177 N.J. Super. 436, 441 (Ch.Div. 1980) (where the trial court noted that HLA blood and tissue typing is a valuable tool for proving paternity and, therefore, would be admissible in a disputed paternity case after the party seeking the admission of the evidence demonstrated that the equipment or methodology used had a high degree of scientific reliability and that *22 the test was performed or administered by qualified persons); M. v. S., 169 N.J. Super. 209, 216 (Law Div. 1979) (where the trial court noted that HLA testing represented the state of the art in blood testing to determine paternity). See also N.J.S.A. 9:17-52(c), of the New Jersey Parentage Act, which provides that evidence of paternity may include genetic or blood tests, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity.
To the best of our knowledge, however, this is the first instance in New Jersey where HLA test results have been held admissible in the context of a criminal case. Here, the State sought to use the HLA test results to corroborate Guzman's testimony that defendant had sexually assaulted her. The State reasoned that "[i]f the jury determined, after hearing the testimony concerning the HLA test, that defendant was the child's father, that information could then be weighed in determining, beyond a reasonable doubt, whether defendant had sexually assaulted the victim."
The HLA test is based upon the identification and typing of antigen markers found in white blood cells and tissues of the body. Every child has two A-B antigen pairs, one from each parent. By eliminating those antigen markers of the child that match with the mother, one necessarily is left with the antigen markers that the child received from the biological father. If the putative father does not possess the requisite antigen markers, he is excluded as the biological father. If this test does not exclude the putative father, however, it is then left to determine the frequency, expressed in terms of a percentage, with which those paternal antigens appear in the random male population of the same racial or ethnic group as the putative father. See e.g., Kofford v. Flora, 744 P.2d 1343, 1349 (Utah Sup.Ct. 1987); State ex rel. Human Serv. Dept. v. Coleman, 104 N.M. 500, 723 P.2d 971, 973-974 (Ct.App. 1986); Tice v. Richardson, 7 Kan. App.2d 509, 644 P.2d 490, 491 (Ct.App. 1982). Thereafter, the probability of exclusion can be determined by subtracting the above percentage from 100%. The *23 resulting percentage represents the probability that other males can be excluded as the child's biological father or, conversely, the probability that the putative father cannot be excluded as the biological father. See Kofford v. Flora, supra, 744 P.2d at 1349-1350; State v. Hartman, 145 Wis.2d 1, 426 N.W.2d 320, 324 (Sup.Ct. 1988); McCormick, Evidence, § 211 at 657 (3 ed. 1984).
Once the probability of exclusion has been determined, the probability of paternity can be calculated. Unlike the exclusionary result expressed by the probability of exclusion statistic, the probability of paternity statistic expresses an inclusionary result, i.e., the probability that the putative father is the biological father of the child in question. See State v. Hartman, supra, 426 N.W.2d at 324; Ellman & Kaye, "Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?," 54 N.Y.U.L.Rev. 1131, 1141 (1979). "The probability of paternity is derived from a calculation involving the probability of exclusion and a prior probability of paternity by application of Bayes' Theorem, which is a formula for telling a rational decision-maker how additional evidence changes an assumed probability that a hypothesis is true." Kofford v. Flora, supra, 744 P.2d at 1352 (citing Ellman & Kaye, "Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?," 54 N.Y.U.L.Rev. 1131, 1147-1148 (1979)). "Bayes' Theorem, however, does not define the prior probability; the prior probability of paternity must be derived independently." State v. Hartman, supra, 426 N.W.2d at 324. In State v. Hartman, supra, the Wisconsin Supreme Court explained the prior probability of paternity as follows:
Typically, a 50 percent prior probability is employed to calculate the probability of paternity. M.J.B. [v. R.E.B.], supra [144 Wis.2d 638] at 648 n. 5, 425 N.W.2d 404 [(1988)]. Described by the state as being neutral, a 50 percent prior probability assumes a 50 percent likelihood that the defendant is the father and a 50 percent likelihood that a randomly selected man is the father. See M.J.B., at 648, 425 N.W.2d 404. In other words, the prior probability of *24 paternity assumes that it is just as likely that the putative father is the real father as it is that he is not the real father. [426 N.W.2d at 324.]
In the present case, Dr. Johnson testified that she performed a series of tests on blood received from Guzman and her child, as well as from defendant. Initially, Dr. Johnson ran a series of six red-blood cell tests and from those tests was unable to exclude defendant as the father of the child. For this reason, Dr. Johnson proceeded to performed the HLA test. With respect to the HLA test, Dr. Johnson identified the child's genetic markers as A2, A28, B53 and B45 and the mother's, Guzman's, as A28, A30, B53 and B61. Guzman and the child had A28 and B53 in common and, therefore, the child's biological father necessarily had A2 and B45 in his typing. Defendant was identified as having markers A2, A28, B45 and B35. Because defendant had A2 and B45 in common with the child, he could not be excluded as the biological father of the child.[1]
Thereafter, Dr. Johnson determined the probability of exclusion. On the basis of statistical tables, Dr. Johnson stated that the frequency of the A2-B45 combination in the relevant population was approximately 1.9%. Dr. Johnson then factored into the equation that defendant "also had all of the necessary red cell markers of the other six systems." On this basis, Dr. Johnson concluded that the resulting frequency was approximately 1%, and that, therefore, 98.1% to 99% of the black male population could be excluded as the father of the child.
Finally, Dr. Johnson testified that the probability of paternity, i.e., the probability that defendant is the biological father of the child, was 96.55%. She stated that the calculation used to determine this probability was based upon a prior probability of paternity of 50%. This aspect of the calculation, she explained, *25 meant that "everything is equal; [defendant] may or may not be the father of the child." She testified that the probability of paternity statistic is purely objective, with subjective factors such as sexual access having no bearing on the calculation. In conclusion, Dr. Johnson offered the opinion that it was "very likely" that defendant was the biological father of the child.[2]
As noted above, defendant does not contest the admissibility of the probability of exclusion paternity statistic. In this regard we simply note that we are satisfied that the probability of exclusion statistic is relevant and was properly admitted at trial. Consent is not an issue where the defendant is charged with sexual assault in violation of N.J.S.A. 2C:14-2c(3).[3] Therefore, evidence that indicates that the defendant could be the father of a child born at a time consistent with the time period within which conception could have occurred as a result of the sexual assault is evidence that the defendant committed the charged offense. See State v. Hartman, supra, 426 N.W.2d at 325.
We reach a different conclusion, however, with respect to the probability of paternity statistic. In our view, a defendant's *26 probability of paternity is inadmissible in a criminal trial where the defendant is charged with sexual assault and the victim is alleged to have conceived a child as a result of that sexual assault. In so concluding, we adopt the reasoning set forth by the Wisconsin Supreme Court in State v. Hartman, supra, when it held that the admission of evidence of a defendant's probability of paternity, where defendant was charged with sexual assault, constituted reversible error. The Wisconsin Supreme Court reasoned:
Although we have concluded that the probability of exclusion and the paternity index are admissible in criminal proceedings, we are not convinced that a defendant's probability of paternity is also admissible. Unlike the probability of exclusion and the paternity index, the probability of paternity assumes certain facts as a condition of its calculation. As we noted earlier, the calculation of a defendant's probability of paternity is typically based upon a 50 percent prior probability which arbitrarily assumes a 50 percent likelihood that the defendant is the father, and a 50 percent likelihood that a randomly selected man is the father. In other words, the probability of paternity is calculated based upon the assumption "that the mother and putative father have engaged in sexual intercourse at least once during the period of possible conception." M.J.B., supra at 650, 425 N.W.2d 404. Because the probability of paternity assumes that sexual intercourse has occurred, it is improper to use this statistic to prove that sexual intercourse has occurred.
Evidence which informs the jury of the probability that the defendant is the father of a child who was alleged to have been conceived as a result of a sexual assault perpetrated by the defendant is clearly relevant to the determination of whether the defendant sexually assaulted the mother of the child. However, it is antithetical to our system of criminal justice to allow the state, through the use of statistical evidence which assumes that the defendant committed the crime, to prove that the defendant committed the crime. Because the probability of paternity assumes the fact that it is used to prove, it is inadmissible. [State v. Hartman, supra, 426 N.W.2d at 326.]
Additionally, in a paternity case, where the ultimate issue is paternity and not merely the occurrence of sexual intercourse, the factfinder is typically informed that it must disregard the probability of paternity statistic if it finds that the putative father did not have sexual intercourse with the mother during the period of conception. See, e.g., Com. v. Beausoleil, 397 Mass. 206, 490 N.E.2d 788, 797 n. 18 (Sup.Ct. 1986); Kofford v. *27 Flora, supra, 744 P.2d at 1352. In a criminal sexual assault case such as the one before us, however, the ultimate issue is the occurrence of intercourse between the mother and the putative father/defendant. Here, once the factfinder has made the threshold determination as to the occurrence of intercourse, the ultimate issue has been determined and the inquiry is at an end. Thus, the probability of paternity statistic in this context is irrelevant.
We conclude, therefore, that the trial court erred in admitting into evidence the statistic indicating defendant's probability of paternity. In view of this conclusion, we need not address the issues raised by defendant under Point I(B), supra. The other issues raised by defendant under Points II and III, supra, are clearly without merit. R. 2:11-3(e)(2). Consent was not an issue where defendant was charged with sexual assault in violation of N.J.S.A. 2C:14-2c(3) and the State's proofs established that defendant had supervisory or disciplinary power over Guzman, within the intendment of N.J.S.A. 2C:14-2c(3), by virtue of his status as a corrections officer at the Salem County Jail.
We are thoroughly convinced from our study of the record that entirely apart from the statistic indicating defendant's probability of paternity, there was sufficient credible evidence in the record as a whole from which the jury could find defendant guilty beyond a reasonable doubt of second degree sexual assault in violation of N.J.S.A. 2C:14-2c(3). See State v. Reyes, 50 N.J. 454, 458-459 (1967); State v. Moffa, 42 N.J. 258, 263 (1964); State v. Smith, 210 N.J. Super. 43, 49 (App.Div. 1986), certif. den. 105 N.J. 582 (1986). Thus, were we not compelled to reverse by reason of the improper admission of this statistic we would affirm the judgment of conviction.
Accordingly, the judgment of conviction is reversed and the matter remanded for a new trial.
NOTES
[1] Clearly, defendant also had A28 in common with the child. Dr. Johnson explained, however, that since Guzman unquestionably was the mother and, therefore, contributed a pair of genetic markers to the child, the child must have received A28 and B53 from Guzman.
[2] With respect to the verbal predicates associated with the various probability of paternity statistics, Dr. Johnson testified that a resulting probability of paternity of less than 90% is thought of as "not useful," 90% to 94.99% is considered "likely," 95% to 99% is considered "very likely," and 99.1% to 99.79% is considered "extremely likely." This use of terms is consistent with the approach suggested in the Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam.L.Q. 247, 262 (1976).
[3] In order to establish that defendant committed the offense of sexual assault in violation of N.J.S.A. 2C:14-2c(3), the State had to prove that (1) defendant committed an act of sexual penetration with Guzman; (2) Guzman was detained in a prison or other institution at the time of the act, and (3) defendant had supervisory or disciplinary power over Guzman at the time of the act by virtue of his legal, professional or occupational status.