692 A.2d 97

JOHN T. ENDRE, AS ADMINISTRATOR AD PROSEQUENDUM FOR THE ESTATE OF TERRILL JAN ENDRE, PLAINTIFF-APPELLANT, v. DIANE ARNOLD, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 25, 1997—Decided April 24, 1997.

138

Before Judges MICHELS and MUIR, Jr.

*Mark J. Molz* argued the cause for appellant (*Stephen Cristal,* on the brief).

*John T. Bazzurro* argued the cause for respondent (*Wolff, Helies & Duggan,* attorneys; *Mr. Bazzurro*), on the brief.

MUIR, Jr., J.A.D.

Plaintiff, John T. Endre, appeals from a summary judgment dismissing his complaint in this wrongful death-survivorship action where plaintiff alleged defendant, Diane Arnold, breached duties of care owed to plaintiff's decedent which proximately caused the latter's death. Plaintiff alleged that defendant breached not only the duty of care a host owes to a social guest as to conditions of the host's property but also the duty a host owes to a social guest to render aid to one who is injured while on a host's premises and is put at risk by the injury. The trial court granted summary judgment finding no breach of duty.

We affirm. We conclude that, while a host has a well-settled duty to warn a social guest of dangerous conditions of which the host has actual knowledge and of which the guest is unaware, a host also has a duty to exercise reasonable care to render aid to a social guest who the host knows or has reason to know has seriously injured himself or herself. Nevertheless, the evidence presented here, when viewed most favorably to the plaintiff, does not support a conclusion that the defendant-host breached either duty which was the proximate cause of death.

*I.*

We review the competent evidential facts, which come essentially from depositions of defendant and plaintiff, in a light most favorable to the plaintiff. *See Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). Many of the facts are undisputed.

Decedent, Terrill Endre, an alcoholic, and defendant, Diane Arnold, were longtime intimate friends. Decedent, who was divorced and unemployed, spent a considerable amount of time at defendant's home. He had his own key to the home. During his visits, decedent would consume alcoholic beverages. He was a

"vodka person" according to defendant, although he also would bring and drink beer.

Decedent had a history of falling when intoxicated. He fell at his own home, at an apartment defendant rented prior to buying her home, and at her home. According to defendant, "[decedent] was always falling, and he would never let [her] call an ambulance or anything because he said he didn't have hospitalization...."

On July 16, 1993, when defendant returned home around 2 p.m., she found decedent waiting for her. The two planned to go shopping the next day. That afternoon and evening, decedent consumed beer and vodka "right from the bottle." He had brought the beer and vodka with him. Around midnight, defendant ate some food. He "was drunk; very drunk, and just slopping [the food] all over." Prior to the meal, he had eaten nothing that day at defendant's home.

After the decedent finished eating, he went upstairs to go to bed. Defendant followed him "[t]o make sure he made it up all right, because he was drunk." The defendant then came downstairs and fell asleep on the living room couch.

The next morning, sometime between 7 and 7:30, the defendant awoke. She heard a noise, "like stirring." Decedent was lying at the foot of the stairs. She spoke to him. He appeared conscious and in no pain. She told him, "When I come downstairs, you better be up." Decedent responded as she said he always did with an "Uh-huh." Defendant then stepped over him to go upstairs and get dressed to go out shopping. When upstairs, she looked down the stairs and did not see decedent. So, she "figured he was up."

About 7:50 a.m., she came back down the stairs. Again, she found decedent lying at the foot of the stairs. She did not like the way decedent looked. She saw, for the first time, decedent had thrown up. The regurgitation contained blood. She claims she said, "Terry, I'm calling the ambulance," and he grabbed her leg

and said, "No." She then said that she would call plaintiff, decedent's son, and decedent said, "All right."

Plaintiff said he received the call about 8:45 a.m. He said defendant had no urgency in her voice when she asked if plaintiff would come over and help pick up his father. Plaintiff arrived between 8:55 and 9 a.m.

Plaintiff said at first he noticed decedent was worse than he had ever seen him before. He stated his father mumbled, slurring his words, and moved only one side of his body. Plaintiff, on deposition, asserted decedent could not speak except to say "no, no," but he also stated at one point during his deposition his father said "I don't know" twice when asked if he could move or get up. Plaintiff acknowledged defendant asked him to pick up his father.

Defendant then called a neighbor. The neighbor refused to pick decedent up due to concern for possible injury. At that point, 9:06 a.m., six to eleven minutes after plaintiff arrived, defendant called the police. An ambulance took decedent to Rancocas Hospital, where around 10 a.m. he was found alert but not speaking. Subsequently, based on a diagnosis of subdural hematoma, decedent was airlifted to Cooper Trauma Center, where he died on July 18 after craniotomy surgery. When the ambulance left defendant's home, defendant and plaintiff followed in plaintiff's car, but plaintiff stopped to get something to eat at a McDonald's before proceeding to the hospital.

Plaintiff testified defendant told him she heard "a thump, like a bang, a thump" around 4 a.m. on July 17 but that she went back to sleep. He also claimed defendant told him she thought decedent fell at that time. He further testified defendant told him she gave decedent Xanax, a prescription drug, and asserted his father smoked marijuana on July 16 but did not say defendant gave it to him.

There is no evidence in the record as to exactly how decedent ended up at the bottom of the stairs that July 17, 1993. The

parties had completed discovery at the time the trial judge granted summary judgment.

## II.

Three elements are essential for the existence of a cause of action in negligence: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach. *See Anderson v. Sammy Redd and Assoc.*, 278 *N.J.Super.* 50, 56, 650 *A.*2d 376 (App.Div.), *certif. denied,* 139 *N.J.* 441, 655 *A.*2d 444 (1995). Whether a duty exists is solely a question of law to be decided by a court and not by submission to a jury. *Wang v. Allstate Ins. Co.*, 125 *N.J.* 2, 15, 592 *A.*2d 527 (1991).

Here, there is a dichotomy in the duties plaintiff claims defendant owed to decedent. First is the duty a host owes a social guest as to conditions of the property. Second is the duty a host owes to render aid to a social guest who is at peril due to a physical injury sustained while on the host's property. We address these claims separately in the context of the parties' concession the decedent was a social guest of defendant.

The law is well settled regarding the duty a host owes to a social guest as to conditions of the property. The duty is limited. A host need only warn "of dangerous conditions of which [the host] had actual knowledge and of which the guest is unaware." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993); *see also Berger v. Shapiro,* 30 *N.J.* 89, 97–98, 152 *A.*2d 20 (1959). A "host need not undertake to make improvements or alterations to render his home safer for those accepting his hospitality than for himself." *Berger, supra,* 30 *N.J.* at 97, 152 *A.*2d 20. The host is under no duty to inspect his or her premises to discover defects which otherwise might not be known to the casual observer. *Id.* at 98, 152 *A.*2d 20. Where a "guest is aware of the dangerous condition or by a reasonable use of his facilities would observe it, the host is not liable." *Id.* at 99, 152 *A.*2d 20.

██ Plaintiff alleges several defects existed that could have caused decedent to fall. These defects were: (1) the riser depth of the individual steps violated the building code; (2) the headroom above the stairway was too low and also violated the building code; (3) the light illuminating the staircase was insufficient; (4) the carpeting on the steps camouflaged defects; and (5) the handrailing along the stairway wall was loose.

Given the scope of the duty and the principles of law relevant to it, we are satisfied a rational fact finder could not conclude defendant breached her duty of care as to conditions of the property. *See Brill, supra,* 142 *N.J.* at 523, 666 *A.*2d 146. The conditions listed, if they were dangerous, were not hidden. They had existed during the entire time defendant owned the house. As plaintiff concedes in his brief, they were "obvious." If they were obvious, decedent could not have been unaware of them. The evidence discloses *he continuously frequented defendant's home,* often staying overnight. It is therefore undisputed that he had travelled the stairs fairly often, just as he did around midnight on July 16, 1993. It is also undisputed decedent removed and then replaced the "loose" railing on the stairway wall when he helped defendant move furniture upstairs. Given this evidence, we are satisfied that, even if the conditions noted could be considered dangerous, no reasonable fact finder could conclude that the decedent was unaware of those conditions. Consequently, plaintiff's evidence fails to support a conclusion defendant breached her duty to her social guest concerning conditions of her home.

██ The law as to the duty a host owes to a social guest who is at peril due to an injury sustained on the host's premises is not as well settled. We have not been able to unearth any reported decisional law in this state precisely on point. Nevertheless, we are satisfied that a host has a duty to come to the aid of a social guest who the host knows or has reason to know is in serious physical peril due to an accident that occurred on the host's premises. The duty, however, only requires the host to give such assistance as the host reasonably can and to take reasonable

action to turn the injured person over to those qualified to care for the guest.

"[W]hether a *duty* exists is ultimately a question of fairness." *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)). This premise reflects the predicates for creating a duty to act when another human being is in peril as set forth in *Wytupeck v. City of Camden,* 25 *N.J.* 450, 461–62, 136 *A.*2d 887 (1957) (citations omitted):

> "Duty" is not an abstract conception; and the standard of conduct is not an absolute. Duty arises out of a relation between the particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable. In the field of negligence, duty signifies conformance "to the legal standard of reasonable conduct in the light of the apparent risk"; the essential question is whether "the plaintiff's interests are entitled to legal protection against the defendant's conduct." Duty is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct.
>
> . . . .
>
> "Duty" is not a rigid formalism according to the standards of a simpler society, immune to the equally compelling needs of the present order; duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows; and accordingly the standard of conduct is care commensurate with the reasonably foreseeable danger, such as would be reasonable in the light of the recognizable risk, for negligence is essentially "a matter of risk . . . that is to say, of recognizable danger of injury."

More succinctly, "[t]he inquiry [as to whether a duty exists] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Kelly, supra,* 96 *N.J.* at 544, 476 *A.*2d 1219 (quoting *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291). Employing that weighing process, we are satisfied that the common law, particularly in light of the special relationship between a host and a guest, imposes on a host a duty to come to the aid of a social guest who has seriously injured himself or herself on the host's premises even though the injury was sustained through no fault of the host. *Cf. Hake v. Manchester Tp.,* 98 *N.J.* 302, 486 *A.*2d 836 (1985) (police should have promptly administered CPR to youth found hanged by a belt

in a detention room); *Poole v. Janeski,* 259 *N.J.Super.* 83, 84, 611 *A.*2d 169 (Law Div.1992); *see Restatement of Torts* § 314A (1965).

Text and decisional law of other jurisdictions afford support. While recognizing the general common law principle that the law imposes no duty on a stranger to aid a person in peril, including one at risk of death, Prosser and Keaton endorse the imposition of a duty on a host to aid a guest in peril given the special relationship between the parties. *Prosser & Keaton on Torts* § 56 at 375–76 (5th ed.1984). In support of its endorsement, the text refers to "respectable authority" for finding a host owes a duty to a social guest to render assistance if the guest is in peril. *Id.* at 376 (citing *Hutchinson v. Dickie,* 162 *F.*2d 103 (6th Cir.), *cert. denied,* 332 *U.S.* 830, 68 *S.Ct.* 208, 92 *L. Ed.* 404 (1947); *Lindsey v. Miami Dev. Corp.,* 689 *S.W.*2d 856 (Tenn.1985); *Tubbs v. Argus,* 140 *Ind.App.* 695, 225 *N.E.*2d 841 (1967)).

In *Lindsey, supra,* the decedent was a guest at a political fund raiser hosted by defendant. Decedent allegedly jumped off a balcony overlooking a stone foyer. *Id.* at 858. She struck her head and laid unconscious on the ground. The defendant delayed aid to the victim, who later died of a cerebral hemorrhage. Defendant sought summary judgment on grounds he owed no duty to aid the decedent. The Tennessee Supreme Court concluded:

> We find that there was a social guest-host relationship between [the decedent] and the defendant which created a duty on his part to exercise reasonable care to render aid to her when [he] knew or should have known that [the decedent] was seriously injured.
>
> [*Id.* at 860.]

Here, too, the social guest-host relationship existed. That special relationship, when combined with the fact that no other person was available to assist the decedent, satisfies us that the law reposed a duty on the defendant to reasonably assist or aid the decedent. The duty, however, is circumscribed. It requires nothing more than reasonable care under the circumstances. *See Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110; *see also Prosser & Keaton, supra,* § 56 at 377. A defendant is not liable when he or she neither knows, nor should know, of the unreasonableness of

the danger or risk. A defendant "is not required to give aid to one whom he has no reason to know to be ill." *Prosser & Keaton, supra,* § 56 at 377.

■ Here, even with all favorable inferences afforded the plaintiff, defendant had no reason to know the decedent had significantly injured himself until sometime between 7 and 8 a.m. on July 17, 1993. Contrary to plaintiff's assertion, the thump or bang around 4 a.m. does not engender any reasonable inference that the defendant knew or should have known decedent was seriously injured. No reasonable fact finder could conclude that a thump in the middle of the night constituted evidence decedent had been so injured as to require the aid of the defendant. Consequently, no breach of duty occurred at that time.

■ What defendant knew or should have known between 7 and 7:30 a.m. creates a more difficult issue insofar as the appropriateness of the summary judgment. At that time, defendant found the decedent lying at the foot of the stairs. Given her experience with decedent's falling down during his prior drinking bouts, defendant's first encounter with the decedent that morning may not justify a conclusion she breached her duty to aid when she failed to assist him and instead went upstairs to get dressed, although that conclusion may be open to doubt and, therefore, be a jury question when all favorable inferences are afforded to plaintiff. Certainly, when she came back downstairs around 8 a.m. and noticed the blood and regurgitation of decedent's late evening meal, defendant had a duty of reasonable care to render aid to the decedent. This is so whether she had any reason to conclude decedent had sustained the subdural hematoma that ultimately caused his death. In a summary judgment context, the facts created a question as to the reasonableness of the defendant's conduct at that point.

■ Our ruling, however, does not turn on the breach of duty issue. We are satisfied that even if there was a breach of duty by the defendant, plaintiff failed to present sufficient evidence from

which a reasonable fact finder could conclude the breach was a proximate cause of death.

Plaintiff conceded at oral argument that all discovery is completed. As part of discovery, plaintiff submitted the report of a medical doctor to support his claim that defendant's breach of her duty to assist the decedent was a proximate cause of death. In that report, the doctor stated:

> [Decedent] sustained a skull fracture and subdural hematoma. These findings signify significant head trauma directly to the central nervous system with significant force to cause neurological symptoms. According to Cecil's Textbook of Medicine, [patients] with subdural hematoma who are hospitalized four or more hours after the accident have twice the mortality of [patients] arriving at the hospital within two hours.

The opinion contains nothing more than a naked assertion of what one author indicates. It fails to demonstrate how the delay in providing aid constituted a substantial factor in the death of the decedent. It fails to explain any anatomical effect of defendant's delay. That delay, in its most favorable light for plaintiff, was around two hours. In its most favorable light, the doctor's report falls short of being even a net opinion.

Plaintiff had the burden of establishing defendant's conduct was a proximate cause of death. *See Dawson v. Bunker Hill Plaza Assocs.*, 289 *N.J.Super.* 309, 322–23, 673 *A.*2d 847 (App.Div.), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996). *Dawson* identifies the principles of law controlling here:

> Even if damage would have occurred in the absence of a defendant's negligence, liability may still be imposed upon a showing that the negligent conduct was a substantial factor in causing the alleged harm. Therefore, there may be two or more concurrent and directly cooperative proximate causes of an injury. Such causes need not be exclusively capable of producing the injury, they need only be a substantial factor in bringing about the harmful result. Stated differently, "[l]iability attaches not only to the dominating cause but also to any cause which constitutes at any event a substantial factor in bringing about the injury."

> Under New Jersey law, an expert's opinion must be based on a proper factual foundation. In other words, "[e]xpert testimony should not be received if it appears the witness is not in possession of such facts as will enable him [or her] to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." "This prohibition against speculative expert opinion has been labelled by modern courts as the 'net opinion rule.'" "Under this doctrine, expert

testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities."

[*Ibid.* (citations omitted).]

*See also Jimenez v. GNOC, Corp.,* 286 *N.J.Super.* 533, 540, 670 *A.*2d 24 (App.Div.), *certif. denied,* 145 *N.J.* 374, 678 *A.*2d 714 (1996). The expert's opinion, if indeed it was ever intended as such by the author, fails to provide specific underlying reasons for a conclusion that defendant's delay constituted a proximate cause of the death. The opinion has no factual foundation. There is no evidential support offered for the conclusion plaintiff draws that defendant's delay in coming to the aid of decedent was a substantial factor in causing the death of the decedent. At its best, the opinion proffers unfounded speculation. It fails, in any degree, to satisfy plaintiff's burden of proof on proximate cause.

## III.

Consequently, we affirm the summary judgment under review.