946 A.2d 1073 (2008)
400 N.J. Super. 258
Kimberly A. LANCOS, Mary Ann McGinley, Cynthia Spekhart, Kevin Salvatore, Bridgette Hintzen, William McGrath, Walter Stubbs, Joanne Grady, Mary Maffei, Cynthia O'Hagan, Kathleen M. Deignan, Thomas Nebeling, Eileen Kane, Robert Dukie, Martha Owens, Jennifer Nelson, Plaintiffs
v.
Malcolm SILVERMAN, Myron Silverman, Marc Lydon, Diane Turton Realtors, Karen Hewston as Agent Servant or Employee of Diane Turton Realtors, Andrea Rogan, Beth Fineberg, Brian Fitter, Chris Morris, Christine Reidigner, Eden Kidner, Eric Reidigner, Heidi Parker, Jamie Cutler, Jenin Cerligione, Jeri Del Vecchio, Jeremy Coyle, John Derose, Julie Rogan, Karen Rosenthal, Kelly O'Leary, Liz Galiardo, Mike Herrighty, Peter Badger, Ryan Fitzpatrick, Theresa Fabia, Tracey Salvo, Victoria L. Audenreid, Sammy O'Connor, Joe Daniels a/k/a Joseph Daniels, Cathy Russo, Marlaine Wade, Macelon D'Sa, Borough of Point Pleasant Beach, Comedy Central, and Malmy, LLC, Defendants.
Marc Lydon, Third-Party Plaintiff,
v.
Myron Silverman, Malcolm Silverman, Diane Turton Realtors, Karen Hewston as agent servant or employee of Diane Turton Realtors, Third-Party Defendants.
Myron Silverman and Malcolm Silverman, Fourth-Party[1] Plaintiffs-Appellants,
v.
York-Jersey Underwriters, Fourth-Party[1] Defendants-Respondents.
No. A-4983-06T2
Superior Court of New Jersey, Appellate Division.
Argued April 14, 2008.
Decided May 14, 2008.
*1075 Robert S. Florke, argued the cause for appellants (Monte & Rudolph, attorneys, Sea Girt; Gary R. Nitsberg and Thomas D. Monte, Jr., Sea Girt, on the briefs).
Charles Hyman, argued the cause for respondent (Kissel Pesce Hirsch & Wilmer, attorneys, Tarrytown, NY; Mr. Hyman, of counsel and on the brief).
Before Judges LINTNER, GRAVES and SABATINO.
The opinion of the court was delivered by
LINTNER, P.J.A.D.
This appeal arises from the collapse of an outdoor deck at a leased beachfront house during a party on July 6, 2002, in which eighteen individuals were injured. Sixteen[2] people filed personal injury *1076 claims against several defendants, including the owners of the beach house, Myron and Malcolm Silverman. At the time of the collapse, the house, which was insured for fire, extended coverage, and vandalism, did not have personal liability insurance protection. Myron and Malcolm Silverman[3] filed a fourth-party complaint, asserting professional negligence against their insurance broker, York-Jersey Underwriters (York). A three-day jury trial took place.
Prior to deliberations, the jury was given the following written interrogatories:
1. Have the Plaintiffs proven by a preponderance of the credible evidence that the Defendant-Insurance Broker was negligent in the procurement of insurance for the Plaintiff[s]?
Yes ____ or No ____
If your answer is no, proceed no further and return your verdict. If your answer is yes, proceed to question no. 2.
2. Have the Plaintiffs proven by a preponderance of the credible evidence that any loss that they may suffer as a result of the claim presented against them was a proximate result of the negligence of the Defendant?
Yes ____ or No ____
Eventually, the jury advised the judge that it could not reach a verdict on the first question because four of its members voted "yes" and two voted "no." It informed the judge, however, that it had had a unanimous verdict of the second question with all six voting "no." The judge discharged the jury and advised counsel to brief the issue and move for either a mistrial or entry of judgment.
Following oral argument on the parties' cross-motions for judgment, the judge issued a letter opinion on May 2, 2006, and entered a judgment of no cause for action in favor of York, based upon the jury's unanimous determination that there existed no proximate cause. He denied plaintiffs' motion for judgment, noting that they had not moved for judgment during the trial. Following settlement of the underlying action, plaintiffs filed their notice of appeal. Plaintiffs raise several issues, one being the validity of the incomplete verdict, which has not previously been decided by our court. We hold that, although the verdict was incomplete, it nevertheless was valid. We also reject the remaining issue raised by plaintiffs and affirm the judgment as entered.
The following relevant facts were adduced at trial. Ann Silverman Soled, plaintiffs' mother, owned the Point Pleasant property until her death in 1990. Soled had procured homeowner's insurance, covering both the physical property and personal liability, through York. On December 6, 1990, the attorney representing plaintiffs and their brother Frederick, as executors of Soled's estate, contacted York with instructions to transfer "all existing insurance policies" to the Estate. In 1992, Myron and Malcolm acquired the property from the Estate, buying out their brother's interest.
Plaintiffs maintained the existing insurance coverage on the property until 1992 when Myron cancelled the CIGNA policy that had been issued to the Estate. York then procured a new homeowner's insurance policy covering both the physical property and personal liability from The Hartford Fire Insurance Company (Hartford), *1077 naming Myron and Malcolm as insureds.
The policy was renewed for subsequent annual terms until, on April 10, 1997, Hartford mailed a notice of non-renewal to Myron and York, advising that the policy would not be renewed and that all coverage would be terminated as of May 20, 1997. At that point in time, the licensed insurance broker assigned to plaintiffs' York account was Marilyn Raven. The non-renewal notice, which Myron could not remember receiving, stated:
As your agent has probably informed you, your above numbered policy will not be renewed in this company beyond the Policy Expiration Date stated above and will terminate on said Date. We regret any inconvenience that this might cause you, but we suggest that you contact your agent in order to arrange for replacement insurance as of said Expiration Date so that there will be no interruption in your insurance protection.
Myron stated that he was unable to recall receiving this letter but it was "obvious[]" that he did, in fact, receive it.
According to Myron, he did not contact York following the receipt of the non-renewal notice because "they're the ones that supply me with the insurance." He did, however, remember speaking with a woman from York in or about 1997, but did not recall speaking with Raven specifically nor did he remember the contents of any such conversation. Malcolm, who played no role in obtaining insurance for the property, testified that all contact respecting insurance was through Myron. Myron owned several properties, was also a landlord, and knew what personal liability coverage was.
Raven testified that since "it was [her] responsibility to follow up on [the notice of non-renewal] to notify [Myron] . . . [she] would have taken the initiative . . . to contact [Myron], to let him know, to explain exactly what was happening and what [York's] procedure was to replace that coverage." Although Raven did not have an independent recollection of contacting Myron, she based her testimony on what would have been her standard practice.
As a result of an industry-wide shift in risk assessment, it became difficult to procure insurance for beachfront properties due to the risks associated with natural disasters. Accordingly, plaintiff's Hartford policy was replaced by York with a FAIR Plan policy issued by the New Jersey Insurance Underwriting Association (NJIUA) on May 20, 1997. N.J.S.A. 17:37A-1 to -27. While the FAIR Plan policy insured the property for various causes of loss, including fire and mischief, the FAIR Plan policy did not include personal liability coverage. The FAIR Plan application was filled out and signed by Myron.
Raven's standard procedure, upon the replacement of a client's homeowner's policy with a FAIR Plan policy, was to contact the client by telephone to explain that the FAIR Plan did not offer personal liability coverage. She explained that she would have advised Myron that he had two options, one to obtain liability coverage by extending the homeowner's coverage on his residence to the Point Pleasant property or, if that was not feasible, to obtain a separate stand-alone policy. Raven testified that she would recommend that the customer extend the liability coverage from their current homeowner's policy because it would cost approximately fifty dollars per year as opposed to several hundred dollars per year for a stand-alone policy. She noted that the file contained information that Myron's homeowner's policy was with USF & G and the policy number. She related that the USF & G policy was handled by another broker, not *1078 York; thus, that information would have come from direct communication with Myron, presumably the telephone conversation.
Once insured by the FAIR Plan, both Myron and Malcolm received annual renewal applications. The renewal applications were sent on a yearly basis from 1998 through 2002. Written on the second page of the three-page application was the following:
This policy is basic quality of essential property insurance, and does not include many coverages normally provided in a homeowner's policy voluntarily issued by Standard Insurance Company. For example, this policy does not include liability insurance, flood insurance, theft insurance or replacement cost coverage. You should seek homeowners coverage in the voluntary market, either directly or through your insurance agent or broker.
Each year, Myron would sign the application and return it to NJIUA with a check for the premium. Above his signature was a certification in bold type indicating he had read the questionnaire. He admitted that he signed the applications without reading them, that he was "very lackadaisical." He assumed that they had full coverage and conceded that, had he read the renewal notice's explicit statement that the FAIR Plan did not include personal liability coverage, he would have realized that he was not covered for personal liability and contacted his broker.
John T. Klagholz, an insurance consultant, testified as an expert for York. According to Klagholz, the advice given by Raven was the correct course of action and there was no obligation to follow up because the average purchaser of insurance would understand the options. He related that the NJIUA FAIR Plan renewal notices provided adequate notice for the average insured to understand that the policy did not contain liability coverage and gave the insured the opportunity each year to pursue other coverage with the agent.
Plaintiffs' expert, G. Wayne Patterson, testified that York breached its duty to serve and advise plaintiffs. Specifically, he opined that, during the period of time between the cancellation of the Hartford policy and the collapse of the deck, York had numerous occasions to discuss with plaintiffs whether they had liability coverage and with what carrier it was placed. He testified that there was "a special relationship" that required York to find out from Myron if he had other coverage, to look at his entire portfolio, and audit the policies to see if there were any holes in coverage that needed filling.
On appeal, plaintiffs first contend that the judge erred in denying their pre-trial motion for summary judgment. Denying the plaintiffs' motion for summary judgment, the judge found that the real factual dispute is whether the conversation between Raven and Myron took place. Plaintiffs assert on appeal that York's failure to obtain liability insurance represented a breach of its duty as a matter of law. They maintain that Raven's testimony was speculative because she had no independent recollection of her purported communication with Myron and it was insufficient to establish that York discharged its duty to obtain personal liability coverage.
Insurance brokers, like agents, "are obliged to inform insureds of available coverage." Weinisch v. Sawyer, 123 N.J. 333, 340, 587 A.2d 615 (1991) (citing Sobotor v. Prudential Prop. & Cas. Ins. Co., 200 N.J.Super. 333, 337-41, 491 A.2d 737 (App.Div.1984)); see also Rider v. Lynch, 42 N.J. 465, 476, 201 A.2d 561 (1964); Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J.Super. 255, 259-60, 523 A.2d *1079 665 (App.Div.1987). "The fiduciary relationship gives rise to a duty owed by the broker to the client `to exercise good faith and reasonable skill in advising insureds.'" Aden v. Fortsh, 169 N.J. 64, 79, 776 A.2d 792 (2001) (quoting Weinisch, supra, 123 N.J. at 340, 587 A.2d 615). In DiMarino v. Wishkin, 195 N.J.Super. 390, 393, 479 A.2d 444 (App.Div.1984), this court determined that an insurance broker was liable for its client's damages where the broker expressly agreed to procure insurance at the request of the client but failed to do so and did not inform the client of such failure.
Rider, supra, 42 N.J. 465, 201 A.2d 561, involved an eighteen-year-old with a limited ability to read English. She told her broker that she needed auto insurance for a car owned by her fiancé who gave her permission to use the car while he was out of state. The broker issued a non-owner's insurance policy, but did not explain that the policy only covered automobiles not used regularly by the insured or any relative. The coverage she wanted was thus useless because she and her family planned to use the car on a regular basis, a fact the broker knew or should have known. Neither the woman nor her father read the policy. The father was involved in an accident and brought suit on behalf of the daughter against the insurer and the broker after the insurer denied coverage.
Rejecting the insurer's claim that the woman's failure to read the policy could be considered as contributory negligence, the Court pointed out that, based upon the agency relationship, both the woman and her father "were entitled to rely upon and believe that the broker had fulfilled his undertaking to provide the coverage impliedly agreed upon, and that the policy sent to them represented accomplishment of that undertaking." Id. at 482, 201 A.2d 561.
In Aden, supra, 169 N.J. 64, 776 A.2d 792, the insureds asserted that after purchasing a $48,000 condominium they advised their insurance broker of the price of the condominium and that they had contents valued at $16,000. The broker claimed that the insured sought a policy with minimum coverage. The policy issued provided coverage in the amount of $1000 in the event of damage to the dwelling. A fire occurred, causing $20,000 in damage. In its opinion, the majority reaffirmed the ruling in Rider, applying the same rationale to eliminate comparative negligence as a defense based upon the failure of an insured to read the policy, noting that "[a]n insured who hires and pays a professional broker does so to reduce, if not eliminate, the risk that an inadequate policy will be procured." Id. at 86, 776 A.2d 792. The Court, however, held that its elimination of comparative negligence as a defense did not prevent a defense that the failure of an insured to read the policy severs the causal connection between the broker's neglect and the harm sustained by the insured. Id. at 82, 776 A.2d 792.
Here, the judge correctly identified the factual dispute revealed by Raven's deposition testimony that, based upon her standard practice and the notation in her file respecting Myron's homeowner's policy, she advised Myron of plaintiffs' options to acquire personal liability coverage following Hartford's non-renewal. There is nothing in the record to suggest that York promised to obtain a liability policy. Indeed, Myron testified that he never contacted York to advise them that he wanted liability coverage. Moreover, plaintiffs' admitted failure to read the warning respecting *1080 the lack of liability coverage in the FAIR Plan policy established a genuine factual issue of causation between York's allegedly negligent conduct and the harm sustained.
We next address the jury verdict. The general principles regarding jury interrogatories are well settled. "[A] trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418, 690 A.2d 575 (1997). "The purposes of submitting interrogatories to the jury `are to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized.'" Id. at 419, 690 A.2d 575 (quoting Wenner v. McEldowney & Co., 102 N.J.Super. 13, 19, 245 A.2d 208 (App.Div.), certif. denied, 52 N.J. 493, 246 A.2d 452 (1968)). "`A trial judge is obliged to give a comprehensible explanation of the questions that the jury must resolve and [to inform the jury] of the law applicable to the issues in the case.'" Myrlak v. Port Auth. of N.Y. & N.J., 302 N.J.Super. 1, 19, 694 A.2d 575 (App.Div.1997) (quoting Vallejo v. Rahway Police Dep't, 292 N.J.Super. 333, 342, 678 A.2d 1135 (App.Div.), certif. denied, 147 N.J. 262, 686 A.2d 763 (1996)), aff'd in part, rev'd in part, 157 N.J. 84, 723 A.2d 45 (1999).
Plaintiffs maintain that the jury did not comprehend the instructions that a verdict on each question required at least a five-to-one vote. They further contend that the jury did not follow the judge's instruction that "if you can't come to a conclusion on Number 1 you don't go to Number 2." Plaintiffs misread the transcript. In his charge, the judge instructed the jury on the need to have at least five jurors agree on each interrogatory. As to the order in which to answer the interrogatories, the judge instructed, "if you say no [to Question One] you don't have to proceed any further, you return your verdict. If your answer to Question Number 1 is yes, you'll now go to Question Number 2."
While deliberating, the jury passed a note to the judge, indicating that it had "come to a firm conclusion on Number 1. There's [sic] four affirmative yes [sic] and . . . two nos and on Question Number 2, four nos. We believe that this leads us to a ruling in favor of [York]." The judge then instructed the jury that a four-to-two vote was unacceptable, that a vote of five-to-one, or six-to-zero was necessary on each question to have a verdict, and that a "no" vote on the first interrogatory does preclude a juror from deliberating with respect to the second. The judge did not mention the jury's consideration of the second interrogatory before deliberating on the first. After further deliberations, the jury advised that it was deadlocked on the first interrogatory with a vote of four-to-two, but that it had agreement of all six jurors with a "no" vote on the second interrogatory. The judge determined that he would discharge the jury, stating, "this is the first time that this has happened to me where they didn't follow my instructions because my instructions were if you can't come to a conclusion on Number 1 you don't go to Number 2."
Thus, it appears from the record, contrary to plaintiffs' contention, that the jury, though deadlocked, was well aware of the need to have at least five jurors agree on each question. Further, although the jury was instructed to answer the second interrogatory if they voted "yes" on the *1081 first, it was never expressly instructed not to proceed to the second if they could not reach a conclusion on the first.
We next turn to plaintiffs' argument that the jury's unanimous vote on the second interrogatory is inconsistent with its four-to-two vote on the first. Plaintiffs concede in their appellate brief that the judge correctly instructed the jury that, in order for York to prevail on the issue of proximate cause, it must establish by a preponderance of the evidence that plaintiffs' actions were the sole proximate cause of their lack of insurance, whereas plaintiffs could prevail so long as York's negligence was simply a proximate cause, among others. See Aden, supra, 169 N.J. at 77, 776 A.2d 792 (holding that although contributory negligence is generally not a defense in a professional negligence case, "if the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable"). Plaintiffs, however, rationalize that because the jury had to decide whether York was negligent as a condition precedent to determining proximate cause, the verdict is inconsistent. We disagree.
Jurors are required to deliberate on every question, irrespective of how they voted on previous questions. Mahoney v. Podolnick, 168 N.J. 202, 226, 773 A.2d 1102 (2001). Where inconsistent answers to jury interrogatories are irreconcilable, thus bespeaking jury mistake or confusion, a "verdict based thereon cannot stand." JMB Enters. v. Atl. Employers Ins. Co., 228 N.J.Super. 610, 616, 550 A.2d 764 (App.Div.1988). The issues of negligent conduct on the part of York and causation were separate issues squarely placed before the jury. Causation and breach of duty are separate elements. See Endre v. Arnold, 300 N.J.Super. 136, 142, 692 A.2d 97 (App.Div.), certif. denied, 150 N.J. 27, 695 A.2d 670 (1997). The first interrogatory dealt with the issue of fault, while the second with causal relationship.
Plaintiffs received the FAIR Plan renewal notices on a yearly basis for five years prior to the loss. Myron conceded that had he known the nature of personal liability coverage and had he read the renewal notices' explicit statement that such coverage was not included in the FAIR Plan policy, he would have realized that he was not covered, and contacted his broker. The jury was free to determine that Myron's failure was an independent intervening cause that severed the causal connection between the alleged negligent conduct of the broker and the harm suffered by plaintiffs. Thus, the jury's unanimous finding that York's conduct was not a proximate cause of the plaintiff's loss was not irreconcilably inconsistent with its four-to-two affirmative answer, albeit not a valid verdict, to the question respecting York's negligent conduct.
Because the issue has not been specifically addressed by our courts, we deem it necessary to determine whether the failure of the jury to reach a valid verdict on the first question necessarily invalidates its determination on the second. The decision in Bree v. Jalbert, 87 N.J.Super. 452, 472-73, 209 A.2d 836 (Law Div.1965), aff'd o.b., 91 N.J.Super. 38, 219 A.2d 178 (App.Div. 1966), is instructive. In Bree, the jury returned a general verdict of no cause for action but neglected to answer any of the special interrogatories. Judge Botter determined that the verdict was valid so long as "[t]he failure to answer some or all of the interrogatories is not equivalent to a finding inconsistent with the general verdict." Id. at 479, 209 A.2d 836. *1082
The specific issue has been addressed by the federal courts. Skyway Aviation Corp. v. Minneapolis, N. & S. Ry. Co., 326 F.2d 701, 703-04 (8th Cir.1964), involved a midair collision between the plaintiff's and defendant's airplanes. The jury was presented with four special interrogatories: (1) was the defendant negligent; (2) was defendant's negligence a proximate cause of the accident; (3) was the plaintiff negligent; and (4) was plaintiff's negligence, a proximate cause of the accident. Id. at 703. The jury answered "yes" to the first two questions, "no" to the fourth, but did not answer the third question. The District Court, over the defendant's objection, entered judgment in favor of the plaintiff. Id. at 703-04. On appeal, the Circuit Court held that the jury's failure to answer the third interrogatory would not invalidate the special verdict.
It mattered not that the jury was deadlocked on the special verdict's unanswered question with respect to this issue of plaintiff's negligence inasmuch as the jury must have agreed that even if plaintiff's violation of the rules amounted to negligence, it did not constitute a proximate cause of the collision. Plaintiff's negligence has no bearing on the ultimate decision of this case since the finders of fact held there was no causal connection between any negligence of plaintiff and the ensuing collision.
[Id. at 704.]
"The failure to answer interrogatories is not fatal . . . where answers to such questions, favorable to the party against whom judgment is rendered, would not necessarily render the judgment erroneous." Gulf Refining Co. v. Fetschan, 130 F.2d 129, 135 (6th Cir.1942), cert. denied, 318 U.S. 764, 63 S.Ct. 666, 87 L.Ed. 1136 (1943); see also Technical Res. Servs., Inc. v. Dornier Med. Sys., Inc., 134 F.3d 1458, 1466 (11th Cir.1998) (holding that jury's responses to answered interrogatories necessitated judgment for defendant regardless of how jury might have answered unanswered interrogatories); Black v. Riker-Maxson Corp., 401 F.Supp. 693, 696 (S.D.N.Y. 1975).
We conclude that the jury's verdict, though incomplete, was not invalid because it did not suffer from confusion, mistake, or irreconcilable inconsistency. Having determined the absence of proximate cause, a necessary element for a claim of negligence, a valid verdict of negligent conduct on the first interrogatory would have been, at most, academic. Stated another way, had the jury, by a five-to-one or six-to-zero vote, answered the first interrogatory "yes," entry of judgment in favor of defendant would have been proper, nonetheless, by virtue of the jury's unanimous determination that plaintiffs failed to prove all the required elements of their cause of action. Accordingly, we need not intervene.
Prior to the commencement of opening statements, the judge granted York's motion to bar plaintiffs from informing the jury that eighteen persons were injured as a result of the deck collapse. Plaintiffs contend on appeal that precluding them from establishing that the deck collapse caused eighteen people to suffer injury increased their burden of proof by preventing the jury from "appreciat[ing] the magnitude of liability to which plaintiffs were exposed by renting the house without liability insurance."
Addressing York's in limine motion, the judge stated:
I think it'd be highly prejudic[ial] to tell the [j]ury that this case precipitated because *1083 [eighteen] people were injured when a deck failed.
What I think is appropriate . . . to tell the [j]ury is that [plaintiffs] inherited the property, as I understand it, that they decided not to live there, but they decided to rent the property out. We all know that this is a resort community that almost  a good percentage of all the homes that are along the ocean are rented. There's nothing wrong with that. And that because of the fact that it is to be a rental in a commercial  they were very much concerned that they had coverage.
. . . I don't think it's necessary for the [j]ury to know that [eighteen] people fell off the deck. . . .
. . . .
The fact that there was this accident is of no moment. There's no question you can say to the [j]ury [that plaintiffs were] concerned that they were renting . . . the property to the public and they wanted protection should something happen on the property. The fact that something happened on the property is of no moment. The question is whether or not there should have been some type of coverage.
So I'm gonna grant the defendant's motion with respect to that. [Plaintiffs] can . . . develop all they wish as to what their concerns were, that they wanted coverage, they knew this was a rental income, they knew there was exposure. But we don't really have to tell the [j]ury that, in fact, [eighteen] people were injured on the property . . . because that's really prejudicial to the defendants.
Despite the judge's instructions, and without any fault on the part of counsel, when plaintiffs' expert was asked during direct examination what facts he considered, he answered: "the salient facts of the case is a question of coverage and a question of whether or not there was liability coverage at the time the deck collapsed." York's counsel interceded, and the judge stated, "[w]hat happened is irrelevant. There was an incident. I think that's the best way to refer to it. There was an incident where there was exposure."
N.J.R.E. 403 provides:
[R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.
A trial judge has broad discretion in making relevance and admissibility determinations under N.J.R.E. 401, 402, and 403, which we will not disturb, absent a manifest denial of justice. State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982); In re Commitment of R.S., 339 N.J.Super. 507, 531, 773 A.2d 72 (App.Div.2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002); Bitsko v. Main Pharmacy, Inc., 289 N.J.Super. 267, 284, 673 A.2d 825 (App.Div. 1996); Thomas v. Toys "R" Us, Inc., 282 N.J.Super. 569, 581-82, 660 A.2d 1236 (App.Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995); Dinter v. Sears, Roebuck & Co., 252 N.J.Super. 84, 92, 599 A.2d 528 (App.Div. 1991); State v. Catlow, 206 N.J.Super. 186, 193, 502 A.2d 48 (App.Div.1985), certif. denied, 103 N.J. 465, 511 A.2d 648 (1986).
The reasons stated by the judge for the exercise of his discretion were provided to the parties and were appropriate. Khoudary v. Salem County Bd. of Soc. Servs., 281 N.J.Super. 571, 578, 658 A.2d 1317 *1084 (App.Div.1995). His N.J.R.E. 403 analysis respecting the likelihood of undue prejudice and lack of probative value was unassailable.
Plaintiffs next maintain that Malcolm was entitled to summary judgment because he did not participate in the conversation with Raven and did not receive the non-renewal notice from Hartford. Plaintiffs' contention is unavailing. Discovery revealed that Malcolm entrusted Myron to handle the insurance and played no role in either obtaining or maintaining insurance on the property. Moreover, both he and Myron received the annual FAIR Plan renewal notices. His conduct in failing to read those notices, like Myron's, supported the jury's determination of lack of proximate cause.
Finally, plaintiffs assert on appeal that damages should not be capped at $500,000, the liability limits of the Hartford policy, as asserted by York. The trial court reserved ruling on the issue pending resolution of liability. Our determination that the entry of the judgment of no cause for action was valid renders plaintiffs' contention regarding damages moot.
Affirmed.
NOTES
[1] Improperly pleaded as third-party.
[2] There were twelve persons named as plaintiffs in the underlying complaint. The record indicates that Myron and Malcolm Silverman, in response to York's motion in limine, sought to introduce evidence that eighteen persons were injured.
[3] Since this appeal only involves the Silvermans' claim against York, we refer to them as plaintiffs.