**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4128-18T4

CHARLES PERKINS,

    Plaintiff-Appellant,

v.

RICHARD NOBLETT,

    Defendant-Respondent.

_____

Argued telephonically March 5, 2020 –
Decided April 1, 2020

Before Judges Koblitz, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0068-17.

Justin D. Turner argued the cause for appellant (Barry, Corrado, Grassi & Gillin-Schwartz, PC, attorneys; Christopher Gillin-Schwartz, on the brief).

Eric S. Robinson argued the cause for respondent (The Law Office of Debra Hart, attorneys; Eric S. Robinson, of counsel and on the brief).

PER CURIAM

Plaintiff Charles Perkins appeals from March 27 and April 4, 2019 orders entering a no-cause judgment in favor of defendant Richard Noblett following a jury trial, and an April 17, 2019 order denying his motion for a new trial. We affirm.

In 2015, plaintiff was a passenger on a New Jersey Transit bus, which collided with a vehicle defendant operated. Plaintiff alleged he was "forcefully thrown forward, and ended up on the bus floor." He was evaluated at a hospital and released the same day. In 2017, plaintiff filed a complaint against defendant for negligence, seeking damages, which defendant contested.

Plaintiff's answers to interrogatories certified he sustained the following injuries from the accident: "[l]umbar central herniation L3-4 with impingement superimposed on a bulge at L3-4; left lumbar radiculopathy with paresthesia[] of left lower extremity; L5-S1 broad bulge; spondylolisthesis of L4-5; grade 1 anterolisthesis L4-5; cervical spurring [C3] through T1; post-traumatic cervicalgia; cervical spondylosis C3-4 through C7-T1." In response to an interrogatory inquiring about prior injuries the accident aggravated, plaintiff certified he was "not claiming aggravation or exacerbation of a previous injury," but "sustained a prior lumbar injury approximately [ten-to-thirteen] years ago at

A-4128-18T4

Freehold Raceway when a chair in which he was seated broke or detached from the floor, and he fell to the ground."

At trial, plaintiff testified he could not recall whether he fell to the bus floor after the collision. He testified he did not enjoy a vacation he took following the accident because he "was having problems." Moreover, he enjoyed bowling as a hobby and before the accident he experienced leg or back pain only occasionally, but after the accident, could no longer keep his head up to watch bowling pins. When asked about the prior incident at the raceway, he described having "some back problems and whatever. And that was it."

Plaintiff's daughter also testified and stated his injuries from the accident disrupted his balance when he stood, and "the biggest thing that [she] noticed was . . . he can't hold his head up[,] . . . it bothers him almost constantly." When asked about changes from the prior incident, she stated the following:

> [Plaintiff's daughter:] Yeah. There's way more . . . everything that I just said about how he can't hold his head up anymore. He has pain. . . . But it's definitely a noticeable difference now.
>
> [Plaintiff's counsel:] How about his walks? Can you describe that walk for the jury?
>
> [Plaintiff's daughter:] Yeah. Well, it's a lot less now. Where I used to . . . let him walk the . . . three miles to McDonald's because it was good for him and

everything. . . . I think it's too much for him anymore. So not as much. He . . . just does little walks now.

[Plaintiff's counsel:] And how about the bowling . . .

[Plaintiff's daughter:] Bowling, he doesn't bowl anymore. No. That . . . definitely was affected, yeah, a lot.

She further noted plaintiff "complains of pain constantly with me," and "[h]e's always holding on to his neck, [and] . . . [t]hat's not how he was before."

Approximately one month after the accident, plaintiff began treatment with Dr. Andrew Glass, a neurosurgeon. Dr. Glass testified as follows:

[Plaintiff] reported that he was facing forward and napping at the time, and that he was not wearing any type of restraint. When the vehicle was impacted by the pickup truck, he experienced onset of neck pain and back pain.

He was brought in by emergency medical services, . . . [a]nd after that, he was complaining of neck pain on both sides of the back of his neck going down to his trapezius. . . .

And then he also reported low-back pain radiating down his left leg, ending either behind his knee or in (inaudible) region.

He specifically denied spine symptoms of a similar nature before this accident. He reported that in 2005, he had been in a spectator seat at a motor freeway and the chair broke. He experienced neck pain and low-back pain. He received non-surgical care. And over time, the symptoms resolved. And then he was pain-

4

free for multiple years and then, unfortunately, had recurrent neck and back symptoms after this motor vehicle collision.

Dr. Glass further noted plaintiff had a "more than [seventy-five] percent loss of flexibility of the neck," "more than [fifty-percent] loss of his forward bending." He reviewed a cervical MRI, which revealed "spondylosis at all the segments in the neck going from C3 to T1," which was "appropriate for somebody [eighty-two] years of age." Additionally, he reviewed a lumbar MRI that showed "L3-4 central herniation, L4-5 grade one anterolisthesis and an L5-S1 (indiscernible)."

Dr. Glass opined the collision with defendant's vehicle caused plaintiff permanent injuries. With respect to plaintiff's prior injury from the raceway, he stated: "Were it not for the trauma of this bus accident, [plaintiff] may never have become painful in either of those two areas, and sitting here today might not have any pain."

On cross-examination, the defense confronted Dr. Glass with plaintiff's treatment records from 2005 to 2008, for neck and back pain with various doctors subsequent to the raceway incident. Chiropractic records revealed plaintiff presented in May 2005 with neck and back pain, radicular symptoms into both legs, and numbness and tingling. In August 2005, plaintiff reported

5

back pain and spasms, increased pain with stairs, prolonged sitting, standing, walking, or lifting anything over five to ten pounds. These complaints persisted as noted throughout treatment records for several months. Indeed, an April 2006 report from plaintiff's chiropractor noted he complained of neck and back pain.

May 2005 neurology records revealed plaintiff presented with low back pain and stiffness, radiating up and down his back and into his legs. The records stated plaintiff had occasional paresthesia to the hands and legs, along with back spasms and difficulty sitting, standing, laying down, and walking after twenty to thirty minutes. A July 2005 record revealed plaintiff received a back brace after reporting pain radiating into his left leg with some weakness, neck pain into the left arm, occasional paresthesia in both hands, and difficulty sitting, standing, and walking.

A May 2006 treatment record from a pain management physician revealed plaintiff reported low back pain on both sides, occasional pain in the posterior aspect of his left leg and knee, and wore a lumbar corset. An August 2006 note from a neurosurgeon noted plaintiff experienced low back pain into his left leg since the raceway incident. Chiropractic treatment records in 2007 and 2008, continued to reflect complaints of pain in plaintiff's right and left lower extremities, neck pain into the left shoulder and arm, and occasional low back

6

pain into the lower extremities with standing, walking, and laying down. Notwithstanding, Dr. Glass testified he reviewed these treatment records and attributed plaintiff's injuries to the 2015 incident.

At trial, defense counsel sought to read plaintiff's answer to the interrogatory regarding aggravation of his prior injuries, which stated:

> Q: If a previous injury, disease, illness or condition is claimed to have been aggravated, accelerated or exacerbated, specify in detail the nature of each and the name and present address of each healthcare provider, if any, whoever provided treatment for the condition.
>
> Plaintiff's answer: Plaintiff is not claiming aggravation or exacerbation of a previous injury. However, plaintiff sustained a prior lumbar injury approximately [ten] to [thirteen] years ago at Freehold, New Jersey Raceway when a chair in which he was seated broke or detached from the floor and he fell to the ground. Plaintiff recalls having treated with physical therapy. He may have treated with other providers whose names he cannot recall. He filed a personal injury claim through a Philadelphia attorney whose name he cannot recall. Subsequent to his treatment and to the best of his recollection, his symptoms resolved.

Plaintiff objected to: "He filed a personal injury claim through a Philadelphia attorney whose name he cannot recall." He argued the language was unduly prejudicial because it painted him as litigious. Defense counsel explained the interrogatory answer was relevant because "it's one thing to say . . . maybe I don't remember . . . going to a doctor in 2005, but if you have a

lawsuit in 2005, I think that . . . adds more weight to the need to read the entire interrogatory and the credibility that would be assessed against [plaintiff]." Counsel explained the interrogatory answer was necessary to give the jury the context of the reading. Counsel also noted he would be reading from a deposition transcript from plaintiff's prior lawsuit. The judge overruled plaintiff's objection.

Defense counsel then read the following portion of plaintiff's deposition from the former lawsuit into the record:

> [Question:] Do you remember the date this accident happened?
>
> [Answer:] I can't remember the exact date, no.
>
> [Question:] It was April 21, 2005.
>
> Answer: Okay right.
>
>   . . . .
>
> Question[:] What do you remember happening?
>
> Answer: Happening? I remember sitting down and, boom. And then I got all excited, and then the pain started going in my back and then in my neck, everything. I get really – I got really frustrated and I went out there.
>
>   . . . .

A-4128-18T4

[Question:] After the incident happened, did you go over to the first aid area?

[Answer:] You want me to explain?

Question: Sure[.]

Answer: When I got disoriented there, Danny said to me, I am taking you down to the infirmary. What I can remember of it was Danny took me down to the infirmary and the doctor examined me there and the lady took my blood pressure in there.

Question: What was bothering you when you went down there?

[Answer:] Pains up my neck ran down in my legs.

[Question:] Are you still treating with Dr. Brady?

Answer: No. He released me.

Question: Actually, he released you looks like January of 2006.

Answer: When was it?

Question: January of 2006.

Answer: I can't remember when he did it.

Question: Did Dr. Brady's treatment help?

Answer: Yeah. It helped. Twice a week, like I said.

Question: How did it help?

9 <span>A-4128-18T4</span>

Answer: Well, it felt good when they were doing what they were doing to me, machinery, massages, exercises and everything he did. I can't remember everything he did.

Question: By the time they discharged you, apparently in January of 2006, did you feel better than when you started?

Answer: It was still bothering me, my neck and back. I wouldn't lie to you. It's still bothering me.

Plaintiff's counsel also read from the deposition as follows:

Question: Is there anything that you don't do now anymore that you were used to doing and accustomed to doing before this accident happened at the race track?

[Answer:] No. I try to do the same stuff on account of my psychology stuff. I have to do my walking and things like that, my exercises. I wear this thing here, this thing here. (Witness indicated).

The defense called its expert orthopedist Dr. Roy Friedenthal. He evaluated plaintiff and reviewed medical records before and after the accident with defendant. Dr. Friedenthal diagnosed plaintiff with a cervical and lumbar strain and multi-level degenerative changes but saw no sign of an acute structural injury or abnormality. He explained the difference between a strain injury and a structural injury as follows: "We're all familiar with strain. You lift something heavy and your arm aches for a few days or a week or two. That's a strain injury. . . . If you rupture your biceps . . . that's a structural injury." He

10

found plaintiff's "clinical presentation was certainly not consistent with an acute rupture of a disc." Rather, "[t]hese are all chronic changes. These aren't trauma changes. There's no fracture. There's no dislocation. There are no signs of trauma. Just lots of degenerative change. . . . This gentleman is in his eighties and he's entitled to wear-and-tear change." Dr. Friedenthal concluded "[plaintiff] suffered a non-structural strain" from the accident and plaintiff's medical records did not support that he was asymptomatic prior to the accident.

Plaintiff moved for a directed verdict on liability, which was denied for reasons unrelated to this appeal. The judge then held a charge conference. The prepared jury questions asked the following:

> 1. Was the negligence of the [d]efendant . . . a proximate cause of the motor vehicle accident of June 12, 2015?
>
> If yes, proceed to question #2. If No, cease your deliberations.
>
> 2. Was the negligence of the NJ Transit bus driver . . . a proximate cause of the motor vehicle accident of June 12, 2015?
>
> If yes, proceed to question #3. If No, go to #4.
>
> 3. Apportion liability between the defendant and the NJ Transit bus driver.

11

4. Has [p]laintiff proven by objective credible medical evidence that he sustained an injury proximately caused by the motor vehicle accident of June 12, 2015?

If yes, proceed to question #5. If No, cease your deliberations.

5. What amount of money, in a lump sum, will fairly and reasonably compensate [p]laintiff for pain, suffering and loss of enjoyment of life?

The jury found defendant's negligence was a proximate cause of the accident and no fault on the bus driver's part. However, on question four, the jury answered "no" regarding whether plaintiff proved he sustained an injury from the accident.

Plaintiff moved for a new trial. He argued the outcome was prejudiced because the trial judge allowed defense counsel to read his interrogatory answer regarding a prior lawsuit into the record and again during summations. Plaintiff also objected to question four on the jury instruction sheet.

The trial judge denied the motion, explaining the prior lawsuit was relevant to provide context for the deposition transcript from the prior suit and plaintiff's assertion that there was no prior exacerbation or aggravation of his prior injuries. The judge also concluded question four on the jury sheet was appropriate. He noted liability was contested and "it was up to the jury to believe or not believe whether there was any injury sustained by [plaintiff] that was

purportedly or allegedly caused by the [2015 accident]." The jury could "accept or reject all or part of the testimony of each of the witnesses that were called . . . [which] included, but [was] not limited to, Dr. Glass and Dr. Friedenthal, in addition to Mr. Perkins' testimony." The judge also noted plaintiff's lack of "objection with regard to the instructions proposed during the conference or the following day prior to closings."

The judge found the jury instructions "in the context of this case and what was presented were sufficient, and the verdict sheet was not misleading." He stated proximate causation remained at issue, was a separate question from liability, and it was "within the province of the jury to believe or not believe any of the testimony." The judge concluded the alleged errors, cumulatively, did not amount to a miscarriage of justice.

I.

A trial judge may grant a motion for a new trial if "it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). A miscarriage of justice exists when a "pervading sense of 'wrongness'" justifies the "'undoing of a jury verdict[.]'" Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 599 (1977)). A motion for a new trial will be granted if the damages

verdict is "so disproportionate to the injury and resulting disability shown as to shock [the court's] conscience and convince [it] that to sustain the award would be manifestly unjust." Baxter, 74 N.J. at 596; see also Cuevas v. Wentworth Grp., 226 N.J. 480, 510 (2016).

"Credibility is truly an issue for the jury. . . . [T]he prevailing party is entitled to 'the benefit of all reasonable inferences' from the proofs and 'if reasonable minds could differ,' the verdict must stand." Doe v. Arts, 360 N.J. Super. 492, 502-03 (App. Div. 2003).

On appeal, we apply the same Rule 4:49-1(a) standard as the trial judge. See R. 2:10-1. However, we "defer to the trial court in those areas where the trial court has expertise, or a 'feel of the case,' e.g., the credibility or demeanor of the witnesses." Lindenmuth, 296 N.J. Super. at 49 (quoting Thomas v. Toys "R" Us, Inc., 282 N.J. Super. 569, 579 (App. Div. 1995)).

Plaintiff reasserts the arguments made to the trial judge, namely: (1) defense counsel's publication to the jury of the existence of plaintiff's prior personal injury lawsuit resulted in undue prejudice and a miscarriage of justice, requiring a new trial; (2) because both medical experts agreed the accident caused an injury, question four on the jury questionnaire was "superfluous" and its inclusion "unnecessary and plain error;" (3) the parties' agreement on

causation requires reversal of the denial of a new trial because "the jury's 'no cause' verdict on damages is a clear miscarriage of justice;" and (4) the cumulative effect of the aforementioned errors warrants reversal.

## A.

We owe "substantial deference to the evidentiary rulings of a trial judge." Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 319 (2006) (citing DeVito v. Sheeran, 165 N.J. 167, 198 (2000)). Accordingly, absent a showing the trial court abused its discretion, we will not reverse an evidentiary determination unless we conclude it "was so wide of the mark as to constitute a manifest injustice." E & H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 24-25 (App. Div. 2018) (citing Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Pursuant to N.J.R.E. 607, "for the purpose of impairing or supporting the credibility of a witness, any party . . . may examine the witness and introduce extrinsic evidence relevant to the issue of credibility . . . ." "Although extrinsic evidence may be admitted to impeach a witness . . . its probative value as impeachment evidence must be assessed independently of its potential value as substantive evidence." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 494-95 (1999).

Plaintiff's answers to interrogatories stated he was not claiming an aggravation or exacerbation of a previous injury and denied prior neck injury, pain, or treatment. The evidence from the 2005 raceway incident revealed a prior medical condition, and plaintiff's deposition from that case noted the fall caused immediate neck pain and required subsequent treatment. Plaintiff's medical records showed three years of treatment with multiple medical professionals for neck and back pain. The trial judge concluded referencing the prior lawsuit was relevant to place in context the transcript of the deposition read to the jury from plaintiff's prior lawsuit. The publication of plaintiff's answer to the interrogatory was not a miscarriage of justice warranting a new trial.

B.

Jury interrogatories "require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." Wenner v. McEldowny & Co., 102 N.J. Super. 13, 19 (App. Div. 1968). In reviewing the verdict sheet for reversible error, the court "should consider it in the context of the charge as a whole." Ponzo v. Pelle, 166 N.J. 481, 491 (2001) (citing Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997). Generally, verdict forms are not

16

grounds for reversal unless misleading, confusing, or ambiguous. <u>Sons of Thunder,</u> 148 N.J. at 418.

Negligence and proximate causation are separate and distinct elements, and typically separate questions. <u>Lancos v. Silverman</u>, 400 N.J. Super. 258, 272 (App. Div. 2008). Negligence alone does not constitute proximate cause; rather, the negligent act must be a "substantial factor" in bringing about the injury. <u>Perez v. Wyeth Labs. Inc.</u>, 161 N.J. 1, 27 (1999).

Plaintiff's counsel did not object to question four when the judge asked for comments on the jury instructions. Even if counsel had objected timely, we disagree that the jury should have been instructed that defendant conceded proximate causation. Dr. Friedenthal found the accident caused only a strain and not a permanent injury. Even though the verbal threshold did not apply, the jury was free to reject Dr. Friedenthal's testimony that the accident caused a strain based on the totality of the evidence presented and its assessment of plaintiff's credibility.

Indeed, "[a] jury 'need not give controlling effect to any or all of the testimony provided by experts even in the absence of evidence to the contrary.'" <u>Kozma v. Starbucks Coffee Co.</u>, 412 N.J. Super. 319, 325 (App. Div. 2010) (quoting <u>State v. Spann</u>, 236 N.J. Super. 13, 21 (App. Div. 1989)). "'The jury

A-4128-18T4

may adopt so much of it as appears sound, reject all of it, or adopt all of it.'"

Ibid. (quoting Spann, 236 N.J. Super. at 21). Therefore, it was exclusively a jury question whether plaintiff sustained an injury as a result of the accident.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION