# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0100-19T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.E.M.,

    Defendant,

and

J.E.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.S.E.,
a minor.

_____

Argued October 1, 2020 – Decided October 26, 2020

Before Judges Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0227-19.

Anne E. Gowen, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn Veasey, Deputy Public Defender, of counsel; Anne E. Gowen, on the briefs).

Ellen L. Buckwalter, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Ellen L. Buckwalter, on the brief).

Louise M. Cho, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Louise M. Cho, on the brief).

PER CURIAM

Defendant J.E.[1] appeals from an August 19, 2019 guardianship judgment terminating his parental rights, as well as the parental rights of defendant S.E.M.,[2] to their daughter, R.S.E. (Rose). We affirm, substantially for the reasons set forth in the well-reasoned opinion of Judge Bernadette DeCastro.

---

[1] We refer to the adult parties by initials, and to the child by a fictitious name, to protect their privacy. R. 1:38-3(d)(12).

[2] S.E.M. is not involved in this appeal.

The evidence is set forth in detail in the judge's opinion, and only a summary is required here. Rose was born prematurely in November 2017. On December 10, 2017, she was due to be discharged from the hospital. The Division received a referral from the hospital because S.E.M.'s parental rights to her two other children were terminated in June 2017, and the hospital had limited information about Rose's father.

The Division quickly learned J.E. was the father but he had not visited Rose since S.E.M. was discharged on November 30, 2017. The Division contacted J.E. to develop a plan for Rose's placement and asked him to meet at the hospital before Rose was discharged. Through a series of phone calls on the evening of December 10, 2017, J.E. informed the Division he would come to the hospital. However, he did not arrive when he said he would. J.E. also advised he needed to secure a bassinette for the baby and would have to leave his job to care for Rose. Additionally, J.E. disclosed he was "between addresses," living at his girlfriend's home and that of his sister, and he had a criminal history. J.E. stopped answering the Division's phone calls for over two hours that night as staff waited for him at the hospital. At approximately 10:30 p.m., the Division was able to reach J.E. by phone and he stated he would get to the hospital "eventually." The Division advised him Rose's discharge was postponed to the

A-0100-19T2

following day. J.E. agreed to reschedule his meeting with the Division. Although the parties dispute whether the meeting was postponed to the following day or to December 12, 2017, Division records from December 11, 2017 indicate a worker expected to meet J.E. at a local office that day.

On December 11, 2017, a Division worker attempted to locate J.E. throughout the day. The worker visited the home of J.E.'s sister, tried calling J.E., and went to his mother's home. J.E.'s mother advised the Division she did not know where J.E. was. Accordingly, the Division effectuated a "Dodd" removal[3] that night, and placed Rose with her maternal grandmother, B.M. Rose remained in B.M.'s physical custody throughout this litigation. The next day, the Division worker notified S.E.M. and J.E.'s mother that there would be a hearing regarding Rose's status on December 13, 2017 and asked both women to let J.E. know.

On December 13, 2017, the Division filed an Order to Show Cause ("OTSC") under the abuse-and-neglect (FN) docket, seeking temporary custody of Rose. J.E. did not appear for the hearing. The trial court granted the Division's application, due to defendants' unresolved substance abuse and

---

[3]  A "Dodd" removal refers to the emergency removal of a child from a home without a court order, pursuant to The Dodd Act. N.J.S.A. 9:6-8.21 to -8.82.

4

housing issues, as well as the report of an outstanding warrant for J.E. At that hearing, the trial court found Rose's removal was necessary to avoid an ongoing risk to her life, safety, or health. On the return date of the OTSC in January 2018, the trial court granted defendants supervised parenting time. Reportedly, J.E. sporadically exercised his right to visit Rose in January and February 2018. By March 1, 2018, he was incarcerated for a violation of probation and terminated from a Drug Court program.

Following J.E.'s incarceration, the Division met with him and provided him with updates about the case and Rose's progress. The Division also arranged for Rose to visit J.E. when he transferred to the Kintock Halfway House in mid-October 2018. Moreover, before his incarceration, the Division referred J.E. for three substance abuse assessments in January and February 2018. He missed every appointment. Due to his incarceration, J.E. also did not submit to a scheduled psychological evaluation in May 2018 with Dr. Robert Kanen. He eventually completed this evaluation in November 2018.

J.E. appeared before Judge DeCastro at a compliance review hearing on December 4, 2018. That day, the judge approved the Division's plan to terminate defendants' parental rights and permit B.M. to adopt Rose.

A-0100-19T2

In mid-January 2019, J.E. was released from the halfway house. He appeared with counsel at a hearing before Judge DeCastro on January 31, 2019. That day, based on the filing of a guardianship complaint, Judge DeCastro issued an order terminating the FN litigation. The judge further questioned the Law Guardian as to whether she gave J.E. a 5A form to secure counsel when she served him with the complaint and the Law Guardian confirmed J.E. was given the 5A form. Judge DeCastro asked that the 5A be brought to court the next hearing date and warned counsel that the matter would be delayed if J.E. did not submit the completed 5A form. At the next two court dates, in February and March 2019, J.E. did not appear but his counsel did.

By the end of February 2019, J.E. was incarcerated for a violation of parole. In April and June 2019, J.E. appeared with counsel for additional hearings, but he remained in prison for the balance of the guardianship matter and waived prison visits with Rose during this period of incarceration.

Shortly before trial, J.E. asked the Division to place Rose with his parents or sister. The Division sent rule-out letters to J.E.'s parents after J.E.'s mother notified the Division it should not contact her again. By the time J.E.'s sister expressed interest in Rose living with her, the Division, in consultation with Dr. Kanen, determined it would not be in Rose's best interest to be removed from

6

B.M.'s home, as B.M. was the only caretaker Rose had known for well over a year and Rose was living with her two step-brothers, whom B.M. adopted when S.E.M.'s rights to the children were terminated. J.E.'s sister also received a rule-out letter. Neither she nor J.E.'s parents appealed from the rule-out letters or asked for reconsideration of the rule-out. Additionally, J.E. did not request a "best interests" hearing to review alternative options for Rose's placement.

The three-day guardianship trial commenced and ended in July 2019. During the trial, the Division elicited testimony from an adoption worker, Betty Mata, B.M. and Dr. Kanen. The Law Guardian did not offer any documentary or testimonial evidence but supported the Division's application for termination of J.E.'s parental rights.

Ms. Mata testified about the Division's involvement following Rose's birth, the services it offered to J.E., and his lack of compliance with the Division's recommendations. Ms. Mata also provided testimony about visits the Division arranged for J.E. and Rose.

B.M. testified that she was S.E.M.'s adoptive mother and the adoptive mother of S.E.M.'s two sons. Further, she confirmed she was aware of the differences between kinship legal guardianship (KLG) and adoption. According

to her testimony, she preferred to adopt Rose to provide her with greater stability.

Consistent with his earlier reports, Dr. Kanen opined to a reasonable degree of certainty that J.E. posed a risk of harm to Rose, and that J.E.'s cognitive limitations and mental health issues made it unlikely that he could competently interact with doctors, social service agencies, and the educational system on Rose's behalf. Additionally, Dr. Kanen concluded that J.E. suffered from "severe parenting deficits." Further, the doctor attested that J.E. needed to demonstrate that he could stay out of jail, and find and maintain employment and stable housing, before he could provide Rose with a permanent, safe, and secure home. Dr. Kanen determined neither defendant was in a position to parent Rose at that time, nor for the foreseeable future.

Pursuant to the bonding evaluations he conducted, Dr. Kanen also testified that Rose did not view J.E. as a parental figure, as he had never been consistent and reliable in her life. On the other hand, Dr. Kanen opined that Rose was securely attached to B.M., as Rose's maternal grandmother provided her with a safe, permanent, and secure home. Additionally, Dr. Kanen testified Rose would suffer serious and enduring harm if she was not allowed to remain with

8

B.M., and J.E. would be unable to help Rose recover from this harm if she were placed with J.E. This expert testimony was uncontroverted.

J.E. and S.E.M. also testified at trial. Over J.E.'s objection, Judge DeCastro excluded testimony from J.E.'s sister, following a proffer from J.E. that his sister would testify she might consider KLG for Rose and would have been willing to care for Rose if she was asked to do so earlier in the litigation.

On August 19, 2019, Judge DeCastro issued her opinion, terminating defendants' parental rights. The judge found the Division met its burden of proof and established by clear and convincing evidence the four prongs under N.J.S.A. 30:4C-15.1(a). Regarding J.E.'s fitness to parent, the judge calculated J.E. was incarcerated for all but three months of Rose's life, adding:

> [H]is inability to live a criminal[-]free life as he continues to be arrested and incarcerated speaks volumes . . . . [J.E.] has demonstrated that he is prone to infractions and cannot comply with the basic rules of parole. Furthermore, once released, [J.E.] needs to complete the required services and demonstrate that he can be an appropriate guardian to [Rose]. This process could take another year or more, and that is assuming [J.E.] can remain out of prison. [Rose] simply cannot wait.

On appeal, J.E. raises several arguments, including: (1) the Division improperly effectuated a Dodd removal without a finding of "imminent harm;" (2) J.E. was prejudiced by the deprivation of counsel during critical stages of

9

the litigation; (3) the Division failed to prove, by clear and convincing evidence, that it made "reasonable efforts" to reunify J.E. with Rose; (4) the trial court erred in excluding his sister from testifying; and (5) the trial court erred in finding there were no "alternatives to termination" because B.M. did not understand the differences between KLG and adoption. Having considered these and other arguments pressed by J.E., we are not persuaded.

As a threshold matter, the scope of appellate review in a termination of parental rights case is limited. We defer to a trial judge's expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and are bound by the judge's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

A parent's right to maintain a relationship with a child is constitutionally protected. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999) (citing Stanley v. Illinois, 405 U.S. 645 (1972)). Courts honor and recognize this right, imposing strict standards for terminating parental rights. Id. at 347. A court may terminate parental rights only if the State proves, by clear and convincing evidence, the four prongs of the "best interests" test. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986). Specifically, before

termination can occur, the State must show by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

Regarding the third prong, the Division must demonstrate that it made reasonable efforts to provide services to a parent to help correct his or her circumstances and to consider alternatives to parental termination. In re Guardianship of D.M.H., 161 N.J. 365, 386 (1999) (citing N.J.S.A. 30:4C-15.1(a)(3)). Reasonable efforts include:

11

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[Id. at 387 (citing N.J.S.A. 30:4C-15.1(c)).]

In analyzing this prong, the Division's "efforts to provide services '[are] not measured by their success.'" N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 441 (App. Div. 2009) (quoting D.M.H., 161 N.J. at 393). Where the Division has exerted efforts such as seeking out relatives to care for the children, supporting the parent in maintaining a relationship with the children, supervising visitation, and sending the parent to therapy and treatment programs, the third prong is satisfied, despite the parent's failure to rehabilitate him or herself. K.H.O., 161 N.J. at 354; see also N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

Guided by these principles, we turn to J.E.'s first argument and note that if an error has not been brought to the trial court's attention, the appellate court will not reverse on the ground of such error unless the appellant shows plain

12

error, i.e., that the error was "clearly capable of producing an unjust result." R. 2:10-2. Here, we observe that at no point during the FN or guardianship litigation did J.E. formally move to challenge the Dodd removal. Additionally, we note that although J.E. did not secure counsel until the FN litigation was well underway, even when he had the benefit of counsel, he failed to challenge the Dodd removal before or after the FN litigation was dismissed.

Although we are not obligated to consider an issue raised for the first time on appeal, Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), we are satisfied the Division properly effectuated Rose's removal on the evening of December 11, 2017. Indeed, the Division took this step only after trying to meet with, and contact J.E. on December 10 and 11.

As of December 10, 2017, J.E. had not visited with Rose for approximately ten days, did not have a bassinette for her, was "between addresses," admitted to a criminal history, and stated he would have to leave his employment "for now" and stay with Rose. J.E. also told the Division he wanted to pick up Rose that evening and he agreed to meet with the Division to discuss his plans for Rose before she was discharged. Yet, he never appeared at the hospital that day. Thus, Rose's discharge was postponed. Moreover, he could not be located the next day, and did not appear for a meeting at the local Division

office to discuss Rose's situation, despite his statement to the Division that he would meet with staff.

On December 11, 2017, Rose again faced imminent discharge from the hospital. But she could not be placed with S.E.M. in light of S.E.M.'s recent history with the Division, and the Division could not locate J.E. Therefore, we are satisfied the Division properly effectuated a Dodd removal before placing her with her maternal grandmother and step-siblings. Further, we agree with the Division that this step was reasonable, as B.M. was a relative caregiver with whom the Division was familiar, and there was no basis to further delay the infant's discharge from the hospital. We also do not ignore the fact that within forty-eight hours of Rose's removal, J.E. failed to appear at the OTSC hearing, although he was noticed to appear, and he did not appear on the return date of the OTSC in January 2018. Further, in January and February 2018, he opted to take advantage of his court-ordered right to supervised parenting time with Rose, rather than challenge Rose's removal.

Regarding J.E.'s claim that the guardianship judgment should be reversed because he was deprived of counsel for almost a year after Rose's removal, and his lack of counsel caused him to be unable to defend his parental rights, we do not agree. Again, the record reflects J.E. did not appear for the OTSC hearing

14

in December 2017 nor on the return date of the OTSC in January 2018, despite being noticed for these hearings. Additionally, he was noticed for hearings in April and August 2018, but did not attend the proceedings because he was incarcerated in March 2018. Thus, the trial court was unable to advise him of his right to counsel until he appeared in court, which happened in December 2018. See N.J.S.A. 9:6-8.43.

Although J.E. did not receive a 5A form until the FN litigation was well underway, we are satisfied the delayed appointment of counsel does not warrant reversal of the guardianship judgment. Indeed, even when J.E. had legal representation, J.E.'s counsel did not move for J.E. to assume custody during those brief periods when J.E. was not incarcerated. We find this noteworthy because the Division discussed reunification possibilities with J.E. as late as December 2018. Given the totality of circumstances, including J.E.'s repeated incarcerations throughout the FN and guardianship litigation, his mental health issues, his lack of stable housing, his lack of compliance with the Division's recommendations, and Dr. Kanen's uncontroverted testimony that J.E. was unable to parent Rose, J.E. has not demonstrated that the preliminary lack of legal representation wrongfully deprived him of the ability to serve as Rose's caregiver.

A-0100-19T2

Finally, we recognize that "[a]buse-or-neglect and termination proceedings are brought under separate statutory schemes, require different burdens of proof, and allow for different remedies." N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 555 (1994). Therefore, we do not accept that the results of the dismissed FN litigation denied J.E. a meaningful opportunity to prevail in the guardianship matter.

We next find no merit to J.E.'s argument that Judge DeCastro erred in finding the Division made reasonable efforts toward reunification and considered alternatives to termination. Having carefully reviewed the extensive record in this matter, we are satisfied the record overwhelmingly supports the judge's finding.

The record reflects the Division provided referrals for substance abuse and psychological evaluations to J.E. It also made recommendations for J.E. to enroll in certain programs while incarcerated and coordinated supervised visits for J.E. and Rose until he refused prison visits. The Division also offered him bus passes for visits when J.E. was not incarcerated and discussed a plan for his reunification with Rose. Further, the agency kept J.E. abreast of his daughter's progress, as well as court proceedings. Accordingly, we perceive no basis to

16

disturb the judge's finding that the Division satisfied its burden under the third prong of N.J.S.A. 30:4C-15.1(a).

J.E.'s contentions that the Division failed to consider alternative placement options and failed to consider KLG as an alternative to termination are equally unavailing. We recognize the Division has an obligation to "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J. Div. of Youth and Family Servs. v. M.F., 357 N.J. Super. 515, 529 (App. Div. 2003) (quoting N.J.S.A. 30:4C-12.1a). Here, the Division properly considered J.E.'s parents and his sister as caregivers. In June 2019, following J.E.'s request that his parents be considered as resource parents, J.E.'s mother stated she did not want the Division contacting her again. The Division sent rule-out letters to J.E.'s parents after this phone call, giving them the opportunity to appeal, which they did not.

J.E. also claims his sister should have been considered for placement upon Rose's removal. Although Judge DeCastro found J.E. did not request that his sister be considered as a resource caregiver until April 2019, the judge was satisfied Rose would not have been placed with J.E.'s sister after the Dodd removal as J.E. told the Division he sometimes resided at his sister's home. As the judge observed, it would have been contrary to Division policy to place Rose

in a home where her father was living, following a Dodd removal of the child from his care.

When the Division ruled out J.E.'s sister as a caregiver in June 2019, it did so because it determined Rose had a strong attachment to B.M. at that point and it was not in Rose's best interest to be removed from the only caregiver she had known since birth. The Division's determination is consistent with the results of Dr. Kanen's bonding evaluation of Rose and her maternal grandmother. Moreover, we are hard pressed to find error in the judge's decision to support the Division's rule-out decisions since neither J.E.'s parents nor his sister asked for them to be reviewed or reconsidered.

J.E. next argues Judge DeCastro improperly excluded testimony from his sister and that her testimony would have refuted the Division's proofs of its purported "reasonable efforts" and its exploration of alternatives to termination. Again, we do not agree.

Evidentiary rulings are reviewed under an abuse of discretion standard. N.J. Div. of Child. Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016) (citing State v. J.A.C., 210 N.J. 281, 295 (2012)). "Absent a manifest denial of justice, we do not disturb a trial judge's reasoned exercise of his or her broad discretion when making relevance and admissibility determinations." N.J.

A-0100-19T2

<u>Div. of Youth & Family Servs. v. N.S.</u>, 412 N.J. Super. 593, 622 (App. Div. 2010) (citing <u>Lancos v. Silverman</u>, 400 N.J. Super. 258, 275 (App. Div. 2008)).

During the trial, the Division challenged the admissibility of the testimony of J.E.'s sister, T.E., and requested a proffer for her testimony. A discussion ensued, whereby the judge asked why T.E. would be testifying if she was ruled out. Counsel for J.E. responded that the Division knew about T.E. at the outset of the FN litigation, and T.E. would testify that if she had been asked to be Rose's caretaker, she would have accepted and "possibly" would have testified she would have pursued KLG. The Division countered that J.E. "never actually even offered his sister as a resource," that T.E. did not approach the Division until April 2019 to be considered as a resource parent, and she was ruled out. The Division explained it

> made a determination . . . based on how long the child had been there, the lack of contact between [T.E.] and the child and the expert opinion of Doctor Kanen that there was a bond[,] that . . . the child would suffer severe harm if she was removed. And so the Division made a best interest determination.

Judge DeCastro found J.E. failed to pursue a "best interests" hearing prior to trial to contest the Division's rule-out decision of his sister. Further, the judge concluded it was too late to argue T.E. would have been a viable alternative to termination, because Rose had been with B.M. for well over a year and B.M.

had testified she was willing to adopt Rose. Thus, the judge also found that having T.E. testify she "possibly" would have pursued KLG was irrelevant.

Certainly, the Division is authorized to rule out a caretaker on best interests grounds, understanding that the trial court is the "ultimate arbiter of the child's best interests" in a guardianship proceeding. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 84-86 (App. Div. 2013). Based on our review of the record, we are confident Judge DeCastro understood her role and that she would have concluded the Division failed to prove by clear and convincing evidence that there were no alternatives to termination of JE.'s parental rights had the Division been arbitrary in its assessment of T.E. As the judge had the benefit of a substantial record, including the testimony of Dr. Kanen and B.M., before making her evidentiary ruling, and she was aware J.E. had not challenged the Division's rule out of T.E., we decline to find the judge abused her discretion when excluding T.E.'s testimony.

Finally, we are satisfied the judge correctly determined KLG was not a viable alternative to termination. KLG functions as a potential alternative to the termination of parental rights. N.J. Div. of Child Prot. & Perm. v. M.M., 459 N.J. Super. 246, 259 (App. Div. 2019). The Legislature established KLG as an option for children who are in the care of a relative who does not wish to the

20

adopt the child. Ibid. (quoting N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010)); N.J.S.A. 3B:12A-1(c). If a trial court approves KLG as an alternative to termination, the birth parent retains the right to consent to his or her child's adoption and name change. N.J. Div. of Child Prot. & Perm. v. M.M., 459 N.J. Super. at 260 (citing N.J.S.A. 3B:12A-4(a)(2) to (5)). Also, the natural parent can enjoy visits with the child and remains obligated to pay child support. Ibid. Accordingly, a caregiver's consent regarding adoption needs to be informed, unconditional, unambiguous, and unqualified. Id. at 264.

"[W]hen the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004)). Here, B.M. expressly testified she wanted to adopt Rose, noting she already had adopted S.E.M.'s other two children. The record also reflects B.M. was S.EM.'s adoptive mother. B.M. testified the Division explained the differences between adoption and KLG. Additionally, B.M. signed a form acknowledging she received the fact sheet regarding the difference between the two options.

When asked why she preferred adoption, B.M. stated, "[b]ecause I think [Rose] needs the stability and knowing . . . that we're there instead of . . . constantly being uprooted." On cross-examination, she clarified she did not

think Rose would be uprooted but she preferred to adopt Rose since under KLG, "the parents still had their rights. And, they still could be involved in the baby's life. And, [with] adoption . . . they don't have any rights. I have the rights. But, I still don't have any problem with them coming to see the baby like they're supposed to."

Although B.M. did not resort to legalese to convey her understanding of the differences between adoption and KLG, we are satisfied that based on her prior adoption experiences, her acknowledgment of the differences between adoption and KLG, and her unwavering testimony that she preferred adoption, the judge properly found KLG was not a reasonable alternative to termination and that there were no other reasonable alternatives to termination. This finding is amply supported by credible evidence in the record.

To the extent we have not addressed J.E.'s remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22